[No. 39435-9-II.   Division Two.   September 28, 2010.]

PUGET SOUND HARVESTERS ASSOCIATION, *Respondent,* v. THE DEPARTMENT OF FISH AND WILDLIFE, *Appellant.*

936

*Robert M. McKenna, Attorney General,* and *Joseph E. Shorin III, Senior Assistant,* for appellant.

*David S. Mann* (of *Gendler & Mann LLP*), for respondent.

¶1 PENOYAR, C.J. — The Washington Department of Fish and Wildlife (WDFW) appeals the trial court's invalidation of two Washington administrative rules. In 2008, WDFW adopted the two rules, setting the 2008 fall chum salmon fishing schedule in South Puget Sound areas 10 and 11. WDFW allocated fishing opportunities between the gillnetters and purse seiners rather than placing a limit on the total catch of either group. The trial court invalidated the two rules, ruling that they were arbitrary and capricious. We affirm the trial court's rulings invalidating the 2008 versions of WAC 220-47-311 and WAC 220-47-411 as arbitrary and capricious.

## FACTS

### I. BACKGROUND

¶2 WDFW regulates commercial salmon fishing in the Puget Sound by gear type and geographic area. WDFW divides the Puget Sound into several areas, including areas 10 and 11 in the South Puget Sound. There are two major gear types used for chum salmon fishing: gillnets and purse seines.

¶3 WDFW develops rules for salmon fisheries through a process called the "North of Falcon" process. Clerk's Papers (CP) at 74. This process begins with a forecast of salmon expected to return to the Puget Sound during the season. The Indian treaty tribes and WDFW must agree on a total forecast and then on an allocation between treaty and nontreaty fishermen. This agreement includes the number of days the fishery will be open to nontreaty fishermen. WDFW and the Indian treaty tribes generally open different days of the week to their fishing fleets. WDFW then holds a series of public meetings to pursue an agreement between the gear groups—the gillnetters and the purse seiners—on the management of the fisheries—here, areas 10 and 11—during the nontreaty fishing days.

¶4 Although WDFW tries to allocate fishing opportunities between gillnetters and purse seiners by agreement,

this has not been possible in recent years. Ultimately, WDFW must decide the allocation based on the information before it and the law.

¶5 Purse seiners and gillnetters have different methods of catching fish. Purse seiners have equipment capable of catching more fish per boat than the gillnetters, and they have an extremely efficient method of fishing. The gillnetters have more licensed boats, smaller boats, and a smaller catch per boat than the purse seiners. In recent years, the gillnetters have marketed more fish in local markets than the purse seiners. During the 2006 and 2007 seasons, gillnetters caught an average of 725 chum salmon per hour of fishing time, while purse seiners caught an average of 4,893 chum salmon per hour of fishing time.

¶6 Puget Sound Harvesters Association (PSHA) challenged WDFW's 2007 fishing schedule in the Thurston County Superior Court. On June 2, 2008, the trial court entered an order, ruling that there was no rational basis for WDFW's 2007 allocation and invalidated the rules as arbitrary and capricious; it also awarded PSHA attorney fees. The trial court found that WDFW used the benchmark of the relative amounts of the catch for the years 1996-2000 as the sole basis to determine an equitable outcome.

¶7 In 2008, WDFW adopted rules setting the 2008 fishing season for commercial purse seine and gillnet fishing. These regulations, which included the areas 10 and 11 fishing schedule, allocated fishing opportunity between the two groups rather than capping the total catch of either group. WDFW's concise explanatory statement[1] clarifies the reasoning behind this decision: "WDFW believes that

---

[1] Under RCW 34.05.325(6)(a), before it files an adopted rule with the code reviser, an agency shall prepare a concise explanatory statement of the rule. The concise explanatory statement shall identify the agency's reasons for adopting the rule; describe differences between the text of the proposed rule as published in the register and the text of the rule as adopted, other than editing changes, stating the reasons for differences; summarize all comments received regarding the proposed rule; and respond to all comments by category or subject matter, indicating how the final rule reflects agency consideration of the comments or why it fails to do so. RCW 34.05.325(6)(a).

this is the most equitable means of regulating this fishery given the historical variations in catch, differences in fishing efficiency between the two groups, economics of the fishery and market forces, and fluctuations in the fishing effort and fleet sizes between the two groups." Administrative Record (AR) at 11.

¶8 WDFW defined management objectives for Puget Sound commercial salmon fisheries. Those objectives, in order from most to least important, mandated that WDFW (1) ensure the conservation of target species—meet spawning goals, (2) minimize catch or impacts on incidental species (bycatch), (3) monitor and sample all fisheries, (4) maintain the economic well-being and stability of the fishing industry, (5) fully utilize the non-Indian allowable catch, and (6) fairly allocate harvest opportunity between gear groups.

¶9 Until 2003, WDFW scheduled seasons by providing an equal number of days opened for purse seine and gillnet gears in areas 10 and 11. WDFW has never allocated on the basis of catch in any Puget Sound commercial salmon fishery. Between 1973 and 1993, catch shares averaged approximately 50-50. After 2003, WDFW departed from structuring seasons based on an equal number of days in order to better address the objectives of maintaining the economic well-being and stability of the fishing industry and fairly allocating harvest opportunity between gear groups. Since 2003, more fishing opportunity has been provided to the gillnet fleet than to the purse seine fleet in areas 10 and 11 because economic conditions presented a disadvantage to the gillnet fleet with respect to harvest opportunity, economic well-being, and stability. For example, in 2002, the gillnet share of the total chum catch was 5 percent. The gillnet share has increased each year since then, and, in 2007, the gillnet fleet caught 31 percent of harvestable chum salmon.[2] In 2007, WDFW allocated fewer

---

[2] In 2007, the gillnet fleet had five total fishing days in comparison to the purse seine fleet's four total fishing days.

fishing days to the gillnet fleet than in the adopted 2003-2006 seasons.

¶10  WDFW asserts in its concise explanatory statement that the efficiency of the fleets may be related to the abundance and distribution of chum salmon because when the combined catch of the two gear groups was high, the gillnet fleet share of the catch was much lower than in years when chum salmon were in lower abundance and more dispersed. The average chum salmon catch for the seasons since 2001 is more than 366,000 chum salmon, while the average catch from 1973-2000 was 108,000 chum salmon. For the 2008 season, WDFW predicted a similarly high number of chum salmon and "lower gillnet catch effectiveness relative to purse seine gear." AR at 15.

¶11  "[G]iven the complexity of issues involved, the need to consider fisheries other than the Areas 10 & 11 chum fishery, and the failure to reach agreement on catch allocation for the 2008 season," WDFW used fishing schedules to address the needs of the purse seiners and the gillnetters and meet the objective of fairly allocating harvest opportunity between gear groups. AR at 17. According to WDFW's concise explanatory statement:

Achieving a fair allocation of the harvest itself in this fishery by WDFW mandate is not realistic, given the number of and variability within factors that are relevant to such an allocation. These include the number of active fishing licenses in both fleets, the economic investment of individual vessel owners in both fleets, the fishing effort made by individual fishers in both fleets, and the numbers of individuals employed by each fleet. WDFW does not have access to accurate information regarding all of these factors, and it does not have the resources to manage this fishery or others around the Puget Sound on such an intensive basis. Therefore, unless the gear groups can agree on an allocation of fish between themselves, WDFW will continue to regulate to achieve an equitable allocation of fishing opportunity rather than proportion of the harvestable catch.

AR at 17.

¶12 WDFW considered the number of gillnetters versus the number of purse seiners, fees and taxes paid by the gear groups, direct marketing to local buyers by gillnetters, bycatch minimization, and catch proportions between 1973 and 1993, but it concluded that none of those factors justified allocating catch rather than fishing opportunity. An average of 2.5 gillnet vessels are licensed for every licensed purse seine vessel. WDFW concluded that "[d]ifferent numbers of licenses for the two gears are not a reasonable basis for allocating harvest opportunity given the overwhelming difference in catching power between gillnet and purse seine gears and the demonstrated ability of both fleets to compete for the limited total allowable catch of chum salmon." AR at 18. In considering license fees, WDFW wrote in its concise explanatory statement that the fees "are not tied to the amount of fishing opportunity or fish allocated to any particular gear group, nor are they relevant to the goals of conserving fish and wildlife resources." AR at 19. The 2008 fall chum fishing regulations in areas 10 and 11 included Wednesday gillnet openings to allow for catch at a time during the week convenient for sale to weekend local markets. WDFW uses gear restrictions, geographical closures, and season timing to minimize bycatch, species taken incidental to the target species. Further, WDFW's concise explanatory statement asserts that underlying conditions have changed since 1973-1993, a period where catch shares averaged approximately 50-50, so a 50-50 split is not justified in reference to that time period because of differences in the fleets and in external conditions.

¶13 In addressing the management objective mandating WDFW to maintain the economic well-being and stability of the fishing industry, the concise explanatory statement asserts that "[t]he fishery is designed to ensure that the economic well-being and stability of the fishing industry is maintained. The gillnet industry's interest in a season that promoted local/niche marketing initiatives is addressed by including weekly, mid-week openings for gillnet gear." AR at 22. The concise explanatory statement also refers to the

objective of fairly allocating harvest opportunity between gear groups, stating:

> "[W]hile regulations and the management intent for this fishery are expected to result in fair allocation of harvest opportunity, catch outcomes are less certain. . . . WDFW expects that the conditions of the fishery . . . will result in a similar or higher catch rates for gillnet gear. Although difficult to predict, another year of increased catch share for gillnet gear appears likely."

AR at 22. WDFW chose to use fishing schedules "given the complexity of issues involved, the need to consider fisheries other than the Areas 10 & 11 chum fishery, and the failure to reach agreement on catch allocation for the 2008 season." AR at 23.

¶14 The 2008 regulations provided for 12 days of gillnet fishing and 8 days of purse seine fishing in areas 10 and 11. The regulations included Wednesday or Thursday gillnet openings to allow for catch at a time during the week that is convenient for sale to weekend local markets, as requested by the gillnetters. The regulations also allowed gillnetters the opportunity to fish on the first day of a fishing week for every week but week 44. On week 44, the purse seine fleet received a Monday first start; however, gillnetters could fish for 16 hours rather than 8 hours on Thursday of that week.

II. PROCEDURAL HISTORY

¶15 On July 8, 2008, WDFW adopted the regulations setting the 2008 fishing season for commercial salmon. Amendments to WAC 220-47-311 and WAC 220-47-411 designated open periods for commercial purse seine and gillnet salmon fishing in Puget Sound. Subsequently, PSHA, representing nontreaty salmon gillnet fishermen of Puget Sound, brought an action seeking declaratory and injunctive relief under the Administrative Procedure Act, chapter 34.05 RCW, claiming that the fishing schedule for areas 10 and 11 was arbitrary and capricious. The Purse Seine Vessel Owners Association (PSVOA) also filed a

lawsuit petitioning for declaratory and injunctive relief, arguing that the rules were arbitrary and capricious because they allocated more fishing time to the gillnet fleet than to the purse seine fleet. The trial court consolidated both lawsuits, to which the parties stipulated.

¶16 Both parties moved for preliminary injunctions. The trial court denied both motions. PSVOA subsequently stipulated to dismissal of its claim. On June 2, 2009, the trial court entered a final order and judgment. The trial court found that while the matter was "technically moot," it was a matter of substantial public interest because (1) it posed an issue of a public nature, (2) an authoritative determination was desirable to provide future guidance to public officers, and (3) the issue was likely to recur. CP at 236. The trial court concluded:

> WDFW has amply demonstrated a rational basis for allocating based on opportunity, not catch. However, it is evident that WDFW has ample catch history to enable it to predict an approximate share of the catch based on opportunity. The allocations in this fishery appear calculated to reach an approximate percentage of catch for the two competing fisheries of 30% for the gillnetters and 70% for the purse seiners. . . . Nowhere in the record is there an explanation of the rational basis for this result.

CP at 237 (Conclusions of Law 4, 5). The trial court declared the 2008 versions of WAC 220-47-311 and 220-47-411 to be invalid as arbitrary and capricious. Further, the trial court ordered WDFW to pay PSHA reasonable attorney fees and costs, in the amount of $14,267.20, under RCW 4.84.350. WDFW appeals.

## ANALYSIS

### I. ARBITRARY AND CAPRICIOUS

¶17 In a proceeding involving review of a rule, the reviewing court shall declare the rule invalid only if it finds that (1) the rule violates constitutional provisions, (2) the rule exceeds the agency's statutory authority,

(3) the rule was adopted without compliance with statutory rule-making procedures, or (4) the rule is arbitrary and capricious. RCW 34.05.570(2)(c). PSHA bears the burden, here, of showing that WDFW's rules were invalid. *See* RCW 34.05.570(1)(a).

¶18 An agency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances. *Wash. Fed'n of State Emps. v. Dep't of Gen. Admin.*, 152 Wn. App. 368, 387, 216 P.3d 1061 (2009) (quoting *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 905, 64 P.3d 606 (2003)). The reviewing court must consider the relevant portions of the rule-making file[3] and the agency's explanations for adopting the rule as part of its review. *Wash. Indep. Tel. Ass'n*, 148 Wn.2d at 906. "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). Substantial weight is given to the agency's view of the law if it falls within the agency's expertise in that special field of law. *Nw. Steelhead & Salmon Council of Trout Unlimited v. Dep't of Fisheries*, 78 Wn. App. 778, 786-87, 896 P.2d 1292 (1995).

¶19 The burden of proof is on PSHA to prove that the 2008 versions of WAC 220-47-311 and WAC 220-47-411 were arbitrary and capricious. PSHA argues that the administrative record supports allocation in favor of the gillnetters,[4] that the concise explanatory statement does not provide evidence supporting WDFW's decision to advantage the purse seiners, and that there is no rational basis to advantage purse seiners. WDFW argues that there are four primary reasons why its adoption of the rules was

---

[3] RCW 34.05.370(1) requires each agency to maintain an official rule-making file for each rule that it proposes by publication in the state register or that it adopts.

[4] PSHA's argument that the administrative record supports allocation in the gillnetters' favor is misplaced, as the issue is whether the regulations, as adopted, were arbitrary and capricious.

not arbitrary and capricious: (1) The legislature gave WDFW broad discretion to manage the fisheries, including the discretion to specify the time, place, and manner of fishing; (2) no law entitles the gillnetters to a specific or fixed share of the available fish; (3) WDFW's regulations were not calculated or intended to result in any particular gillnet/purse seine catch ratio; and (4) the agency record supports WDFW's decision on how to structure the fishing season. We do not agree with either party's line of argument, but we do hold that WDFW's adoption of these regulations was arbitrary and capricious.

¶20 The statutes authorizing the implementation of WAC 220-47-311 and WAC 220-47-411 are RCW 77.04.020 and RCW 77.12.047. Under RCW 77.04.020, WDFW consists of the state Fish and Wildlife Commission and the director. Under RCW 77.12.047, the commission may adopt, amend, or repeal rules: specifying the times when the taking of wildlife, fish, or shellfish is lawful or unlawful; specifying the areas and waters in which the taking and possession of wildlife, fish, or shellfish is lawful or unlawful; specifying and defining the gear, appliances, or other equipment and methods that may be used to take wildlife, fish, or shellfish; and specifying the times, places, and manner in which the equipment may be used or possessed.

¶21 Under RCW 77.04.012, the mandate of WDFW is

[to] conserve the wildlife and food fish, game fish, and shellfish resources in a manner that does not impair the resource. In a manner consistent with this goal, [WDFW] shall seek to maintain the economic well-being and stability of the fishing industry in the state. The department shall promote orderly fisheries and shall enhance and improve recreational and commercial fishing in this state.

¶22 RCW 77.50.120 further states:

It is the intent of the legislature to ensure that a sustainable level of salmon is made available for harvest for commercial fishers in the state. Maintaining consistent harvest levels has become increasingly difficult with the listing of salmonid spe-

cies under the federal endangered species act. Without a stable level of harvest, fishers cannot develop niche markets that maximize the economic value of the harvest. New tools and approaches are needed by fish managers to bring increased stability to the fishing industry.

¶23 Accordingly, WDFW defined management objectives for Puget Sound commercial salmon fisheries. The objectives, listed in order of importance, "mandate" that WDFW:

1) Ensure the conservation of target species – meet spawning goals;

2) Minimize catch or impacts on incidental species (bycatch);

3) Monitor and sample all fisheries;

4) Maintain the economic well-being and stability of the fishing industry;

5) Fully utilize the non-Indian allowable catch; and,

6) Fairly allocate harvest opportunity between gear groups.

AR at 13.

¶24 WDFW argues that its regulations were not intended to result in any particular catch ratio. WDFW further asserts that there is nothing in the record showing that it intended a 30-70 split, and it did not have sufficient data to confidently predict what catch would result from any given allocation of fishing time. WDFW also argues that it chose to allocate based on fishing opportunity because it cannot accurately predict catch outcomes due to the uncertainty and the variability of the two fleets' catch rates. We do not find these arguments persuasive.

¶25 Together, these arguments illustrate the methodology WDFW used to pursue their six declared objectives, particularly objectives four and six. The record does not support the conclusion that allocation based on fishing opportunity allocation is the only way to fairly allocate harvest opportunity. On the contrary, WDFW has extensive information about the catch likely to result from set openings.

¶26 In WDFW's concise explanatory statement, it asserts that it did not have the staff and financial resources

necessary to collect and monitor the data needed to impose a specific catch share. Further, WDFW would specify catch allocations only if the groups could reach an agreement; since an agreement could not be reached, WDFW chose to allocate based on opportunity rather than catch. However, WDFW had data on the average number of chum salmon caught per hour in previous years. Its data shows that in 2006 and 2007, gillnetters caught an average of 725 chum salmon per hour of fishing time, and purse seiners caught an average of 4,893 chum salmon per hour.[5] Additionally, PSHA argues that WDFW does monitor catches and landings through the mandatory quick reporting system. *See* WAC 220-47-001.[6] Further, the concise explanatory statement indicates that catch rate information is collected by the fishery throughout the season, because "[s]eason schedules described in the proposed 2008 Puget Sound Commercial Salmon Regulations . . . will be changed as the chum salmon runsize is updated and catch rate information is collected from the fishery. The fishery is unlikely to be opened for the entire number of days scheduled." AR at 16.

¶27 Also, in its concise explanatory statement, WDFW concludes:

"[W]hile regulations and the management intent for this fishery are expected to result in fair allocation of harvest opportu-

[5] According to the concise explanatory statement, the gillnet fleet caught 500 chum salmon per hour in 2006 and 1,200 chum salmon per hour in 2007. We note that the concise explanatory statement appears to contain a miscalculation. It is unclear from the record how the gillnetters caught an average of 725 chum salmon per hour of fishing time during the 2006 and 2007 seasons, when the concise explanatory statement states that the gillnet fleet caught 500 chum salmon per hour in 2006 and 1,200 chum salmon per hour in 2007.

[6] All Puget Sound salmon fisheries are designated as "quick reporting required" fisheries, and commercial purchasers and receivers must comply with the provisions of WAC 220-69-240(12). WAC 220-47-001.

The report must include dealer or DRE [direct retail endorsement] holder name and purchasing location, date of purchase, each fish ticket number, including alpha, used on the purchasing date, and the following catch data for each fish ticket used: Total number of days fished, gear, catch area, species, number, and total weight for each species purchased and all take home fish not purchased (wholesale dealer) or sold (DRE).

WAC 220-69-240(12)(a)(ii).

nity, catch outcomes are less certain. . . . WDFW expects that the conditions of the fishery . . . will result in a similar or higher catch rates for gillnet gear. Although difficult to predict, another year of increased catch share for gillnet gear appears likely."

AR at 22. The gillnet fleet caught 31 percent of harvestable chum salmon in 2007. Additionally, WDFW asserts in its concise explanatory statement that the efficiency of the fleets may be related to the abundance and distribution of chum salmon because when the combined catch of the two gears was high, the gillnet fleet share of the catch was much lower than in years when chum salmon were in lower abundance and more dispersed. The average chum salmon catch for the seasons since 2001 is more than 366,000 chum salmon, while the average catch from 1973-2000 was 108,000 chum salmon; for the 2008 season, WDFW predicted a similarly high number of chum salmon and "lower gillnet effectiveness relative to purse seine gear." AR at 15.

¶28 This information demonstrates that fishing opportunity is generally proportional to harvest opportunity. To disconnect one from the other on this record is not supportable. The rule-making record and WDFW regulations indicate that WDFW possessed information regarding catch rates from previous seasons and that WDFW would collect catch rate information throughout the season. Further, the record indicates that WDFW predicted a similar, or possibly higher, catch rate for gillnet gear in 2008, and WDFW forecast that gillnet catch effectiveness would be low in comparison to the purse seine fleet in 2008. While WDFW chose to allocate time on the water rather than capping the total catch of either group, the attending facts and circumstances indicate that, by allocating fishing time, WDFW allocated a share of the fish.

¶29 Furthermore, the decision to allocate based on fishing opportunity must be viewed in light of its impact on the objectives that WDFW properly set for itself in its decision-making process. The decision primarily affects objective number four, to "[m]aintain the economic well-being and

stability of the fishing industry," and objective number six, to "[f]airly allocate harvest opportunity between gear groups." AR at 13. These objectives can be met only by allowing both gear groups the opportunity to catch their "fair share" of the fish. Opportunity to catch a share of the fish depends primarily on two factors: time on the water and gear efficiency. Only by considering both of these factors could WDFW rationally accomplish its stated purposes.

¶30 Instead of considering both time on the water and gear efficiency to estimate relative shares of the fish harvest, WDFW simply allocated time on the water without determining the likely effect of this allocation on fish harvest for the two gear groups. But without this calculus, the likely effect of the decision on WDFW's stated objectives was simply arbitrary. While we agree that precision is not possible, it is not rational for WDFW to ignore the considerable information that it does have to estimate likely harvests. When an agency makes rules without considering their effect on agency goals, it acts arbitrarily and capriciously, without regard to the attending facts or circumstances. Unfortunately, that is what has happened here.

¶31 We emphasize that WDFW need not be mathematically precise in fairly allocating harvest opportunity. First, a guaranteed 50-50 allocation would simply not be feasible, given variables from season to season. More importantly, however, a 50-50 allocation, made without regard to the attending facts or circumstances, would be arbitrary and capricious as well. In setting its schedule, WDFW must consider its management objectives and its mandate to "[m]aintain the economic well-being and stability of the fishing industry" in the state. AR at 13. To align itself with these objectives, WDFW should consider reasonable factors, such as the predicted number of fish, the numbers of each group, and the economics of each group. Here, WDFW claims to have considered factors such as the number of gillnetters versus the number of purse seiners, fees and taxes paid by the gear groups, direct marketing to local buyers by gillnetters, bycatch minimization, and catch

proportions between 1973 and 1993; however, WDFW's consideration of these factors appears to have had little effect on the resulting schedule.

¶32 WDFW must not act cursorily in considering the facts and circumstances surrounding its actions. The defined management objectives do not provide a rational explanation for the disparity in harvest allocation, nor does the concise explanatory statement. Harvest opportunity is not fairly allocated by providing gear groups a share of time on the water unless relative fishing efficiency is taken into consideration. The numbers reflect the current inequality: in 2006 and 2007, gillnetters caught an average of 725 chum salmon per hour of fishing time and purse seiners caught an average of 4,893 chum salmon per hour. WDFW provided no rational basis for the disparity that resulted from its adopted schedule for areas 10 and 11. Accordingly, we hold that WDFW acted arbitrarily and capriciously in adopting the 2008 schedule.

II. ATTORNEY FEES

¶33 WDFW also argues that the trial court abused its discretion by awarding attorney fees and costs to PSHA, because its (WDFW's) actions were substantially justified. Under the equal access to justice act (EAJA), RCW 4.84.340-.360, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). The amount awarded shall not exceed $25,000. RCW 4.84.350(2). The statute provides a statutory cap on attorney fees for each level of judicial review of an agency action. *Costanich v. Dep't of Soc. & Health Servs.*, 164 Wn.2d 925, 934, 194 P.3d 988 (2008).

¶34 We review an award of fees and costs under the EAJA for abuse of discretion. *Moen v. Spokane City Police Dep't*, 110 Wn. App. 714, 717, 42 P.3d 456 (2002). " 'Substantially justified means justified to a degree that

would satisfy a reasonable person.' " *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007) (quoting *Moen*, 110 Wn. App. at 721). The State must show that its position has a reasonable basis in law and fact. *Constr. Indus. Training Council v. Wash. State Apprenticeship & Training Council*, 96 Wn. App. 59, 68, 977 P.2d 655 (1999).

¶35 Because we hold that the rules were arbitrary and capricious, i.e., willful and unreasoning and taken without regard to the attending facts or circumstances, it follows that WDFW's actions were not substantially justified. Accordingly, we conclude that the trial court did not abuse its discretion in awarding attorney fees and costs to PSHA.

¶36 PSHA asks for attorney fees on appeal under the EAJA. Because we conclude that PSHA prevails on appeal and WDFW's actions were not substantially justified, we grant PSHA's request for attorney fees and costs on appeal.

¶37 Affirmed.

HUNT and VAN DEREN, JJ., concur.