# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL LAW & POLICY, AMERICAN WHITEWATER, and SIERRA CLUB, | No. 51439-7-II |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF ECOLOGY, | PUBLISHED OPINION |
| Respondent. | |

LEE, A.C.J. — In 2015, the Department of Ecology (Ecology) promulgated an administrative rule that establishes minimum instream flows of 850 cubic feet per second (cfs)[1] for the lower reach of the Spokane River during summer months (Rule). Ecology's primary basis for establishing a minimum instream flow was to protect and preserve fish habitat within the river.

---

[1] The legally recognized unit of measurement for flowing water is one cubic foot of water per second of time. RCW 90.03.020.

No. 51439-7-II

The Center for Environmental Law & Policy (Center),[2] the Sierra Club,[3] and American Whitewater (collectively CELP) challenge the validity of this Rule, arguing that it exceeds Ecology's statutory authority and is arbitrary and capricious. Specifically, CELP relies on a provision of the Water Resources Act of 1971 (WRA) to argue that Ecology was required to establish a minimum instream flow that protects multiple enumerated instream values, not just fish. CELP also argues that the Rule violates the public trust doctrine and challenges Ecology's exclusion of certain documents containing instream flow recommendations from its rule-making file.

We hold that the Rule is not reasonably consistent with the WRA, and therefore, it exceeds Ecology's rule-making authority. We also hold that the Rule was adopted without regard to the attending facts and circumstances, and is therefore arbitrary and capricious. However, we reject CELP's challenges based on the public trust doctrine and adequacy of Ecology's rule-making file. Accordingly, we hold that the Rule is invalid.

FACTS

A.    THE SPOKANE RIVER

The Spokane River is a shared resource between Washington and Idaho. It begins in northwestern Idaho, flows west through the City of Spokane, and eventually connects to the Columbia River in eastern Washington.

---

[2]  The Center is a nonprofit organization whose mission is to protect and promote stewardship of Washington's freshwater resources through public education, advocacy, policy reform, and public interest litigation.

[3]  The Sierra Club is a national nonprofit organization whose mission is to protect, explore, and enjoy the planet.

2

The Spokane River is an important economic, recreational, and cultural attraction in the Spokane area. Spokane residents regularly use the river for boating, tubing, swimming, and fishing. The river also draws regional visitors when its flows are sufficient to support boating opportunities. A number of small businesses depend on the river to provide recreation-based activities, including river rafting, kayaking, tubing, and guided fishing trips. The river is a central feature of the region's identity, and Spokane residents view the river as an integral part of their community.

B.       AVISTA CORPORATION'S DAMS

Stream flow[4] on the Spokane River is controlled by a series of dams owned and operated by Avista Corporation. Avista operates its dams under a license issued by the Federal Energy Regulatory Commission (FERC) in 2009. The license requires Avista to maintain specific minimum stream flows in the Spokane River throughout the year. Between June 16 and September 30, Avista must operate its Upper Falls and Monroe Street dams to provide minimum stream flows of 850 cfs.

As part of the relicensing process, Avista conducted several studies to evaluate the potential influence of its operations on the natural resources in its hydroelectric project area. Some of these studies examined the general habitat characteristics and spawning activity of trout and mountain whitefish in the Spokane River. Two studies evaluated the relationship between effective fish spawning and stream flows in various reaches of the river. Avista also conducted a whitewater

---

[4] Stream flow is the volume of water that flows down a river or stream and is measured in cubic feet per second. Instream flows are the regulatory stream flow thresholds used by Ecology to determine whether there is water to withdraw for new uses while still protecting fish and other instream resources.

paddling instream flow assessment study, which assessed whitewater boating opportunities on the Spokane River at different stream flows. Nearly all whitewater survey participants preferred flows higher than 1,353 cfs to support boating on the lower reach of the river (downstream of the Upper Falls and Monroe Street dams).

C.    ECOLOGY RULEMAKING

1.    The Spokane Valley-Rathdrum Prairie Aquifer and Municipal Water Supply

The Spokane Valley-Rathdrum Prairie Aquifer underlies the Spokane River. It is the sole source of municipal water supply for the area. The aquifer and the river are highly interactive. Any withdrawal of water from the aquifer has a direct and immediate impact on river flows. Increased groundwater use from the aquifer has led to a decrease in river flows. In the early 1990s, Ecology determined that the river's low flows in late summer were continuing to decline. This prompted Ecology to stop issuing new groundwater rights allowing withdrawals from in the aquifer.

2.    Instream Flow Rulemaking

The state Water Code, chapter 90.03 RCW, authorizes Ecology to set minimum stream flows for a river or stream through a collaborative process with watershed planning groups.[5] RCW 90.03.247(2);[6] RCW 90.82.080(1)(a)(ii). Ecology began working with watershed planning groups

---

[5]  A watershed is an area of land where all of the water that falls into it drains into a common outlet. UNITED STATES DEPARTMENT OF THE INTERIOR, THE USGS WATER SCIENCE SCHOOL, https://water.usgs.gov/edu/watershed.html (last visited June 17, 2019). A watershed planning group is comprised of local governments, who convene and collaborate on their desired management practices for the watershed.

in 1998 to develop instream flow protection for the Spokane River. The watershed planning groups were unable to achieve consensus regarding the minimum instream flows that should be adopted for the Spokane River. Because the members of the watershed planning unit were unable to reach consensus, Ecology initiated rulemaking under the Washington Administrative Procedures Act (APA) to establish minimum instream flows. RCW 90.82.080(1)(a)(ii), (c).

Ecology commenced formal rulemaking in January 2014. Ecology's draft Rule proposed a minimum instream flow of 850 cfs for the downriver reach of the Spokane River between June 16 and September 30, as measured at the Spokane gage,[7] which is located downstream of the Monroe Street dam. Ecology based this instream flow on the recommendation of the Washington Department of Fish and Wildlife's (WDFW) instream flow biologist Hal Beecher. Beecher initially recommended a minimum instream flow between 900 and 1,050 cfs from July 1 to September 30, as measured at the Spokane gage. Several years later, in May 2012, Beecher recommended minimum instream flow of 850 cfs between June 16 and September 30, as measured at the Spokane gage. Beecher's 2012 instream flow recommendation was based on the above discussed trout and whitefish spawning studies, which were conducted as part of Avista's dam relicensing process in 2009. Beecher later qualified this recommendation and emphasized that the

---

[6] RCW 90.03.247 has been amended since the events of this case transpired. However, the amendments do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 90.03.247.

[7] The U.S. Geological Survey (USGS) (the sole science agency for the Department of the Interior) measures streamflow of rivers through stream gages placed at certain locations in the river. USGS, HOW STREAMFLOW IS MEASURED, https://www.usgs.gov/special-topic/water-science-school/science/how-streamflow-measured?qt-science_center_objects=0#qt-science_center_objects (last visited June 17, 2019).

proposed summer flows were "not perceived by [him] as enhancement, rather as a floor." Administrative Record (AR) at 14233.

During the rulemaking comment period, Ecology received hundreds of public comments critical of the 850 cfs minimum instream flow in its proposed Rule. Many of these comments asked Ecology to conduct additional studies on how the proposed 850 cfs minimum instream flow at the lower reach of the river would impact recreation, aesthetics, navigation, water quality, temperature, and broader ecosystem values. Other commenters asked Ecology to assess climate change and interstate implications of the proposed Rule. Small recreational business owners commented that they would be unable to provide recreational river activities, such as float and canoe trips, at the proposed 850 cfs summer flows.

The Center and the Sierra Club sent Ecology a combined comment letter criticizing the proposed Rule, along with 43 electronic documents covering a range of topics, including the return of anadromous fish to the Columbia River, scenic and aesthetic flows in the Spokane River, climate change, fish studies, interstate water issues, and recreational use of the river. The Center and the Sierra Club also provided Ecology with a photographic inventory of 37 key observational points located on the downriver reach of the Spokane River, obtained at five different summer flows. One of these photos showed researchers floating the river in a hard shell kayak in July 2015 at about 770 cfs. Another photo showed people floating down the river in tubes at 770 cfs. And another photo showed a boat navigating the river at 770 cfs. However, the Center and the Sierra Club cautioned that this 770 cfs flow would be unsuitable for larger commercial rafts. American Whitewater, a nonprofit river conservation organization, also sent Ecology a letter in which it

claimed, based on surveys it conducted, that acceptable flows for kayaking, canoeing, and rafting the Spokane River were between 1,500 cfs and 15,000 cfs, with 5,000 cfs as an optimal flow.

Ecology claimed that it considered all of these comments and materials it received during the rulemaking process. Specifically, Ecology stated that it "considered the recreational, aesthetic, and navigational values at multiple stages throughout the process of establishing these instream flows for the river." AR at 3283. However, Ecology rejected the recreational flow criteria of the river in establishing instream flows. Ecology "chose[] not to establish instream flow values based on those recreational needs expressed during the FERC process or any other process including this comment period." AR at 2985.

Instead, Ecology "chose to rely on studies of fish habitat to establish instream flow levels." AR at 3283. Ecology made clear throughout rulemaking that its proposed minimum instream flows were "based upon fish habitat studies," and were "needed for fish survival, including both whitefish and redband trout." AR at 79, 66. Ecology summarily concluded that instream flows that protect fish habitat would also protect the recreational and aesthetic values of the river.

Ecology adopted the Rule in January 2015, and it became effective in February 2015. The Rule establishes minimum instream flows of 850 cfs on the lower reach of the Spokane River, as measured at the Spokane gage downstream of the Monroe Street dam.[8] WAC 173-557-050.

---

[8] The Rule also establishes minimum instream flows for other months of the year. WAC 173-557-050. And it establishes minimum instream flows for the upper reach of the Spokane River, as measured at the Greenacres gage. WAC 173-557-050. However, the only instream flow at issue in this appeal is the instream flow established for the lower reach of the river between June 16 and September 30, as measured at the Spokane gage, which is located downstream of the Monroe Street dam.

A minimum instream flow established by administrative rule, including Ecology's 2015 Rule, is an appropriation of water with a priority date of the rule's effective date. RCW 90.03.345. Water appropriated prior to adoption of the Rule are senior water rights and are not affected by the Rule. However, appropriations after the Rule is established are junior water rights and are interruptible if flow on the Spokane River decreases below the minimum instream flows specified in the Rule. Ecology plans to use the minimum instream flows established by the Rule to manage future water withdrawals from the Spokane River and the aquifer that underlies it. The Rule also establishes Washington's legal interests in the water of the river and aquifer in the event of interstate conflict.

D.     PETITION TO AMEND THE RULE

In February 2016, CELP submitted a joint petition asking Ecology to amend the Rule and increase the 850 cfs summer minimum instream flows as measured at the Spokane gage.[9] Ecology denied the petition in April.

In May, CELP brought suit against Ecology, challenging the validity of the instream flow Rule under the APACELP claimed that the portion of the Rule setting minimum summer instream flows at 850 cfs exceeded Ecology's statutory authority and was arbitrary and capricious. CELP also argued that Ecology had failed to fulfill its responsibilities under the Public Trust Doctrine in adopting the Rule.

CELP also filed a motion to supplement the record before the superior court with three documents related to the Avista dam relicensing process and watershed resource planning

---

[9]  CELP also asked Ecology to amend the minimum summer instream flow established for the Greenacres gage, but that request is not a subject of this appeal.

processes for the region. The specific documents CELP requested be added to the rule-making file were: (1) Ecology's comments to FERC during Avista's dam relicensing, (2) an April 23, 2007, memo in which Beecher noted that habitat rearing at the Spokane gage peaks at 1040 cfs, and (3) a June 30, 2004, document in which Beecher recommended a minimum discharge of 700 cfs at the Post Falls dam. Ecology opposed the motion and submitted declarations in opposition. Three of the agency's rule writers submitted declarations, stating that the documents were not in their custody during the rulemaking process and that they did not consider them when making decisions to set summer minimum instream flows at 850 cfs.

The superior court denied CELP's motion to supplement the record with these three documents. The superior court later denied CELP's petition challenging the validity of the Rule.

CELP petitioned for direct review at the Washington Supreme Court. After briefing was complete, the Supreme Court transferred the case to this court.

## ANALYSIS

A.    VALIDITY OF THE RULE

CELP argues that the 850 cfs summer minimum instream flow established in Ecology's Rule is invalid because it exceeds Ecology's statutory authority and is arbitrary and capricious. We agree.

    1.    Legal Principles

A challenge to the validity of an administrative rule is reviewed under the APA. *Swinomish Indian Tribal Cmty. v. Dep't of Ecology*, 178 Wn.2d 571, 580, 311 P.3d 6 (2013). Under the APA, an agency rule may only be invalidated if it: (1) is unconstitutional, (2) exceeds the agency's statutory authority, (3) was adopted without complying with statutory rule making procedures, or

(4) is arbitrary or capricious. RCW 34.05.570(2)(c). The validity of an agency rule is a question of law, which we review de novo. *Wash. Rest. Ass'n v. State Liquor Control Bd.*, 200 Wn. App. 119, 126, 401 P.3d 428 (2017).

Administrative agencies only possess those powers expressly granted to them by statute or those impliedly authorized by their enabling statutes. *Lenander v. Dep't of Ret. Sys.*, 186 Wn.2d 393, 404, 377 P.3d 199 (2016). When an agency acts within its rule making authority, the agency's rule is presumed valid, and the burden of demonstrating invalidity rests with the challenger. *Wash. Fed'n of State Employee. v. Dep't of Gen. Admin*, 152 Wn. App. 368, 378, 216 P.3d 1061 (2009); RCW 34.05.570(1)(a). The party attacking the validity of a rule must show compelling reasons why the rule conflicts with the legislation's intent and purpose. *Wash. Fed'n of State Employees*, 152 Wn. App. at 386.

"'Administrative [r]ules must be written within the framework and policy of the applicable statutes.'" *Wash. State Hosp. Ass'n v. Dep't of Health*, 183 Wn.2d 590, 595, 353 P.3d 1285 (2015) (internal quotation marks omitted) (quoting *Swinomish*, 178 Wn.2d at 580). An agency exceeds its statutory authority if it adopts a rule that is not reasonably consistent with the controlling statutes. *Id.*

2.      Ecology Exceeded its Rule Making Authority

Central to this case are issues of statutory interpretation. The parties dispute whether the legislature imposed a mandatory duty upon Ecology, in the exercise of its rule making authority, to establish minimum instream flows that protect multiple instream values, rather than a single value chosen by Ecology. Resolving this dispute informs whether Ecology acted within its rule making authority when it enacted the Rule.

The goal of statutory interpretation "is to ascertain and carry out the legislature's intent." *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). When possible, we must give effect to the plain meaning of the statute as an expression of legislative intent. *Id.* In ascertaining the statute's plain meaning, we consider the statutory context, related statutes, and the entire statutory scheme as a whole. *Swinomish*, 178 Wn.2d at 582.

### a. Ecology's authority to establish minimum instream flows

This case implicates several related statutes within the general water code. Ecology's authority to establish minimum instream flows derives from the state Water Code,[10] the Minimum Water Flows and Levels Act,[11] and the Water Resources Act of 1971.[12]

### i. Water Code

The Water Code vests Ecology with the exclusive authority to establish minimum instream flows for the state's streams and lakes. RCW 90.03.247(2). In exercising its authority under the Water Code, Ecology must consult with and consider the minimum flow proposals of the WDFW at all stages of rule development. RCW 90.03.247.

### ii. Minimum Water Flows and Levels Act

Enacted in 1969, the Minimum Water Flows and Levels Act (MWFLA) authorizes Ecology to establish, by administrative rule, minimum flows or levels for public waters for the purposes of

---

[10] Chapter 90.03 RCW.

[11] Chapter 90.22 RCW.

[12] Chapter 90.54 RCW.

protecting fish and other wildlife, recreation and aesthetics, or water quality. *Swinomish*, 178 Wn.2d at 592; RCW 90.22.010. The MWFLA provides, in relevant part:

> [Ecology] may establish minimum water flows or levels for streams, lakes or other public waters for the purposes of protecting fish, game, birds or other wildlife resources, or recreational or aesthetic values of said public waters whenever it appears to be in the public interest to establish the same. In addition, [Ecology] shall, when requested by the [WDFW] to protect fish, game or other wildlife resources under the jurisdiction of the requesting state agency, or if [Ecology] finds it necessary to preserve water quality, establish such minimum flows or levels as are required to protect the resource or preserve the water quality described in the request or determination.

RCW 90.22.010.

Minimum instream flows established by rule "shall in no way affect existing water and storage rights." RCW 90.22.030. And Ecology may not grant the right to divert or store public waters "which shall conflict" with the minimum instream flows it establishes. RCW 90.22.030. Stated another way, the minimum instream flows Ecology establishes by rule are appropriative water rights, subject to the longstanding rule that "'as between appropriations, the first in time shall be the first in right.'" *Fox v. Skagit County*, 193 Wn. App. 254, 264, 372 P.3d 784 (2016) (quoting RCW 90.03.010) (emphasis omitted)).

In 1993, the legislature amended chapter 90.22 RCW to require Ecology, in cooperation with Indian Tribes and the WDFW, to establish a statewide list of priorities in evaluating instream flows. RCW 90.22.060. In establishing such list, Ecology "shall consider the achievement of wild salmonid production as its primary goal." RCW 90.22.060. Thus, the legislature plainly "continued to place a high value on maintaining instream flows to support fish." *Swinomish*, 178 Wn.2d at 593, n. 12.

iii.     Water Resources Act

Enacted in 1971, the Water Resources Act (WRA) sets forth "'fundamentals of water resource policy for the state to insure that waters of the state are protected and fully utilized for the greatest benefit to the people of the state of Washington.'" *Swinomish*, 178 Wn.2d at 593 (quoting LAWS OF 1971, 1st Ex. Sess., ch. 225 § 1). It also provides " 'direction to [Ecology] and other state agencies and officials, in carrying out water and related resource programs.' " *Id.* (quoting LAWS OF 1971, 1st Ex. Sess., ch. 225 § 1).

The WRA recognizes that water is a critical resource and proper utilization of water is necessary to promote public health, economic well being, natural resources, and the aesthetic values of the state. RCW 90.54.010(1)(a). It contemporaneously acknowledges that the supply and availability of water has become increasingly limited. RCW 90.54.010(1)(a). The legislature enacted the WRA to "ensure that available water supplies are managed to best meet both instream and offstream needs" through a comprehensive planning process. RCW 90.54.010(1)(b). To this end, the WRA authorizes Ecology to establish administrative rules that reserve and set aside waters for beneficial use "whenever it appears necessary to the director in carrying out the [WRA's] policy." RCW 90.54.050.

In 2002, the legislature enacted a new section of the WRA in which it "recognize[d] the critical importance of providing and securing sufficient water to meet the needs of people, farms, and fish." RCW 90.54.005. The WRA enumerates three water resource objectives that should guide water resource strategies at the local watershed level: (1) providing sufficient water to meet residential, commercial, and industrial needs; (2) providing sufficient water to support productive

fish populations; and (3) providing sufficient water to support productive agriculture. RCW 90.54.005(1)-(3).

The WRA also provides that the utilization and management of Washington waters "shall be guided" by a number of general fundamentals. RCW 90.54.020. One fundamental declares beneficial uses of water to include domestic, stock watering, industrial, commercial, agricultural, irrigation, hydroelectric power production, mining, fish and wildlife maintenance and enhancement, recreational, thermal power production, and preservation of environmental and aesthetic values. RCW 90.54.020(1). The WRA does not prioritize between these competing beneficial uses of water. RCW 90.54.020.

The WRA lists a number of other competing declarations of fundamentals, including allocating water among potential uses in a way that secures "the maximum net benefits for the people of the state," developing multipurpose water storage facilities, preserving adequate supplies of water in potable condition, developing regional water supply systems, and encouraging water conservation practices. RCW 90.54.020(2). It also provides that the "quality of the natural environment shall be protected and, where possible, enhanced as follows: … Perennial rivers and streams of the state shall be retained with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values." RCW 90.54.020(3)(a).

b.      The WRA requires Ecology to consider all instream values

Relying on the language "shall" in RCW 90.54.020(3)(a), CELP argues that Ecology is obligated to establish minimum instream flows that preserve wildlife, fish, scenic, aesthetic, and environmental and navigational values. Ecology counters that its "primary rulemaking authority"

14

here stems from MWFLA, and that the legislature's use of the word "or" in the MWFLA (RCW 90.22.020) provides Ecology discretion "to determine the best purposes" for which it sets minimum instream flows. Br. of Resp't at 18. We are not persuaded by either party's interpretation.

At the outset, we note that "[t]he meaning of 'shall' is not gleaned from that word alone because our purpose is to ascertain legislative intent of the statute as a whole." *State v. Krall*, 125 Wn.2d 146, 148, 881 P.2d 1040 (1994). The word "shall" in a statute imposes a mandatory requirement "unless a contrary legislative intent is apparent." *Erection Co. v. Dep't of Labor & Indus.*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993). When possible, we derive legislative intent from the plain language of the statute. *Lenander*, 186 Wn.2d at 403.

Here, in considering the statutory context, related statutes, and the entire statutory scheme of the WRA, we hold that CELP's argument that the rule must preserve all instream values is not persuasive. The language CELP relies upon is one of several enumerated general fundamentals meant to guide water resource use and management. RCW 90.54.020. The WRA's stated purpose is to develop a comprehensive planning process that ensures better water management practices and alleviates conflict among competing water users. RCW 90.54.010(1)(b). It is intended to "ensure that available water supplies are managed to best meet both instream and offstream needs." RCW 90.54.010(1)(b). Consistent with the WRA's overall goals of safeguarding public health and economic well-being, and preserving the state's natural resources and aesthetic values, the WRA authorizes Ecology to develop a "comprehensive state water resources program" that "provide[s] a process for making decisions on future water resource allocation and use." RCW 90.54.040(1). The WRA's "[g]eneral declaration of fundamentals" are meant to guide Ecology in

the exercise of its water management duties.  RCW 90.54.020.  They do not impose a list of mandatory requirements for every agency rule that Ecology adopts in the exercise of those duties. The use of the word "shall" directs Ecology what values it must consider.  *See Bassett v. Dep't of Ecology*, ___ Wn. App.2d ___, 438 P.3d 563 (2019) (holding that the legislature's use of the word "shall" in RCW 90.54.020 did not impose a formal test on Ecology to secure maximum net benefits before it allocated water).

However, Ecology's argument is equally unpersuasive.  Ecology argues that the WRA's general declaration of fundamentals has no application when Ecology exercises its rulemaking authority under the MWFLA.  But the MWFLA does not operate in a vacuum.  As discussed above, Ecology's exclusive authority to establish minimum instream flows stems from several statutory provisions within the Water Code.  In enacting the WRA, the legislature recognized that the proper utilization of the state's water resources was "necessary to the promotion of public health and the economic well-being of the state and the preservation of its natural resources and aesthetic values." RCW 90.54.010(1)(a).  The WRA prioritizes comprehensive water resource planning as a way to resolve conflict among competing water users and interests.  RCW 90.54.010(1)(b).  It balances the water needs of the state's growing population with the objective of preserving instream resources so that future generations can continue to enjoy them.  RCW 90.54.010(1)(b).

Under the WRA, Ecology may set aside water for beneficial use "whenever it appears necessary to the director in carrying out the [WRA's] policy."  RCW 90.54.050.  One way for Ecology to do so is by establishing minimum instream flows and levels, which are treated as any other appropriative water right.  In the exercise of that authority, Ecology must meaningfully consider the instream values enumerated in RCW 90.54.020(3)(a), and attempt to preserve them

to the fullest extent possible. This gives effect to the legislative intent of the WRA to ensure that water within the state is protected and "fully utilized for the greatest benefit to the people of the state of Washington." RCW 90.54.010(2).

Ecology's interpretation of its rulemaking authority under the MWFLA is inconsistent with the emphasis the legislature has placed on fully utilizing water for its maximum benefit and ensuring that water supplies are managed to best meet both instream and offstream needs. When read together with the WRA, the MWFLA does not grant Ecology the authority to establish a minimum instream flow for the purpose of narrowly protecting only one instream value that Ecology deems "best." Br. of Resp't at 18. Instead, it directs Ecology to meaningfully consider a range of instream values and to consider how an instream flow that protects one value might impact the others.

This is not to say that a rule is invalid simply *because* it fails to preserve and protect each enumerated instream value. The legislature recognized the near impossibility of appropriating water in a way that satisfies every one of its beneficial uses. RCW 90.54.010. Water is an increasingly scarce resource and putting it to one beneficial use necessarily limits its availability for a competing use. Ecology's role in water resource management is to balance the competing beneficial uses of water and ensure that water is fully utilized to the greatest benefit possible. If the minimum instream flow necessary to protect one value is detrimental to another, the legislature has made the choice clear—the one that protects fish prevails. *See* RCW 90.22.060; RCW 90.54.005(2); RCW 90.82.070. However, the high value that the legislature placed on maintaining instream flows supportive of fish does not mean that Ecology can simply disregard other instream values and narrowly focus only on fish.

17

When viewed under this framework and policy, the Rule challenged here is not reasonably consistent with the statutes it implements. Ecology made clear throughout rulemaking that its proposed minimum instream flows were only "based upon fish habitat studies" and focused only on "fish survival, including both whitefish and redband trout." AR at 79, 66.

Ecology responded to public concern over the proposed minimum instream flow by asserting its position that it may establish a minimum instream flow for the purpose of protecting only one instream value. In its concise explanatory statement, Ecology explained that it had discretion to choose one value for which to set a minimum instream flow. As explained above, this interpretation of Ecology's rule making authority is inconsistent with the framework of the WRA.

Ecology argues that it nonetheless operated within framework of the controlling statutes because it "fully considered" other instream values during multiple stages of its rule making process. Br. of Resp't at 19. However, the record shows that Ecology's consideration involved merely collecting public comments and studies that showed 850 cfs was not sufficient to preserve the recreational and aesthetic values of the river, and then summarily "reject[ing]" these higher instream values. AR at 3283. Such cursory treatment of these other values does not comport with the emphasis the legislature placed on effectively managing water resources to ensure that water is fully utilized to the greatest benefit of the people.

The record does not support Ecology's repeated claim that a minimum instream flow protective of fish would necessarily preserve other instream values. And contrary to Ecology's argument, three photographs showing a boat has not grounded at flows below 850 cfs does not

"plainly show[]" that recreational and navigational uses are "plentiful" at these levels. Br. of Resp't at 24.

Ecology's reliance on Avista's federal license requirements is equally misplaced. Ecology argues that the Rule protects all enumerated instream values because it is "identical" to Avista's federally required flows and "Avista's federal license requires Avista to release flows for recreation." Br. of Resp't at 25. This argument oversimplifies the nature and scope of Avista's license.

Avista's federal license governs the operation and maintenance of five hydroelectric project developments located along the Spokane River. The project area spans several counties in Washington and Idaho, and the license dictates flows on the Spokane River from Coeur d'Alene Lake in Idaho through the city and suburbs of Spokane. The FERC license only requires Avista to operate certain hydroelectric developments on the river in a way that enhances recreation at distinct reaches of the river. Notably, the license does not require Avista to operate its Monroe Street and Upper Falls dams (the hydroelectric dams located just upstream of the river reach at issue here) in a way that supports recreation.

Instead, the FERC license requires Avista to operate the Monroe Street and Upper Falls dams to provide minimum summer flows of 850 cfs from June 16 to September 30 in order to "enhance aquatic habitat for rainbow trout and mountain whitefish in the Spokane River." AR at 8074. And it requires Avista to analyze the spawning habitat in response to flow alterations in the Spokane River below the Monroe Street and Upper Falls dams. Thus, Ecology's argument that its summer instream flows preserve recreation simply because they are identical to the summer flows required by Avista's license is unavailing.

Ecology's attempt to bootstrap consideration of other instream values through its review of Avista's studies is also unpersuasive. Cursory review of certain studies Avista conducted as part of its relicensing process does not constitute meaningful review of the instream values enumerated in RCW 90.54.020(3)(a). And this argument ignores Ecology's own statement that it "chose[] not to establish instream flow values based on those recreational needs expressed during the FERC process."[13]  AR at 2985.

The record shows that Ecology based the 850 cfs flow on fish habitat studies because it believed it had discretion to establish a minimum instream flow for the purpose of protecting only one instream use. This narrow focus on preserving one instream value is not reasonably consistent with the WRA's purpose of ensuring "that waters of the state are protected and fully utilized for the greatest benefit to the people of the state of Washington." RCW 90.54.010(2). Because the Rule was not written within the framework and policy of the applicable statutes, it exceeds Ecology's authority and is invalid.

3.     The Rule is Arbitrary and Capricious

CELP also argues that the Rule is invalid because it is arbitrary and capricious. We agree.

An agency rule is arbitrary and capricious "if it is willful and unreasoning and taken without regard to the attending facts or circumstances." *Puget Sound Harvesters Ass'n v. Dep't of*

---

[13]  Ecology also asserts that the only way to achieve flows higher than 850 cfs is by changing Avista's federal license. However, the record shows that flows measured at the Spokane gage routinely exceed 850 cfs in the summertime, even during very dry years. Ecology's further suggestion that the Rule would impact Avista's license is misplaced. Minimum instream flows established by Rule are appropriations of water with a priority date of the rule's effective date. RCW 90.03.345. Ecology plans to use the minimum instream flows established by the Rule to manage future water withdrawals from the Spokane River and aquifer. The Rule has no influence on Avista's federal license.

*Fish and Wildlife*, 157 Wn. App. 935, 945, 239 P.3d 1140 (2010). As part of our review, we must consider the relevant portions of the agency's rule-making file and the agency's explanations for adopting the challenged rule. *Id.* "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997).

As discussed above, review of Ecology's rule-making file and explanations for adopting the Rule shows that Ecology narrowly focused its Rule on only preserving fish habitat. Instead of considering how the 850 cfs would affect other instream values, Ecology summarily concluded that a flow protective of fish also protected other uses of the river. Nothing in the record supports this conclusion. And the evidence before Ecology showed that the proposed flow would not be adequate to support rafting, kayaking, and other recreational uses of the river. Ecology based the 850 cfs minimum instream flow on WDFW's recommendation, but WDFW qualified its recommendation as a "floor" to protect fish habitat, and he "would oppose lower flows, but not higher summer flows." AR at 14232, 13609.

An agency "must not act cursorily in considering the facts and circumstances surrounding its actions." *Puget Sound Harvesters Ass'n*, 157 Wn. App. at 951. Ecology's explanations for establishing minimum instream flows based only on fish habitat studies without regard to how its proposed flow would impact other instream values was arbitrary and capricious. Therefore, the resulting Rule is invalid.

B.    PUBLIC TRUST DOCTRINE

CELP also argues that Ecology violated the public trust doctrine by enacting the Rule because the 850 cfs minimum instream flow will degrade the public interest in the lands and water of the state. We disagree.

"The public trust doctrine is an ancient common law doctrine" that recognizes the public need for access to navigable waters. *Chelan Basin Conservancy v. GBI Holding Co.*, 190 Wn.2d 249, 259, 413 P.3d 549 (2018). The doctrine has always existed in Washington, and the policy is partially expressed in article 17, section 1 of the Washington Constitution, which reserves state ownership in the beds and shores of the state's navigable waters. *Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 232, 858 P.2d 232 (1993). The state's ownership of tidelands and shorelands is comprised of two distinct aspects—its ownership interests, historically referred to as the *jus privatum*, and its public authority interest, historically referred to as the *jus publicum*. *Caminiti v. Boyle*, 107 Wn.2d 662, 668, 732 P.2d 989 (1987), *cert. denied*, 484 U.S. 1008 (1988).

As owner, the state has fee simple title to such lands and may convey title in any manner that does not contravene the constitution. *Id.* However, " [t]he state can no more convey or give away this jus publicum interest than it can 'abdicate its police powers in the administration of government and the preservation of the peace.'" *Id.* at 669 (quoting *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 453, 13 S. Ct. 110, 36 L. Ed. 1018 (1892)). Thus, the doctrine precludes the State from disposing of its interest in navigable waters in such a way that substantially impairs the public's right of access. *Rettkowski*, 122 Wn.2d at 232. The *Caminiti* court adopted a two-part inquiry to determine whether a challenged legislation violates the public trust doctrine: (1) whether the state, by the questioned legislation, has relinquished its right of control over the jus

publicum and (2) if so, whether by doing so, the state has promoted the public interests in the jus publicum, or else has not substantially impaired it. 107 Wn.2d at 670.

CELP argues that the test articulated in *Caminiti* informs this court's analysis as to whether the Rule violates the WRA. We hold that it does not.

There are two problems with relying on the framework outlined in *Caminiti* here. First, the *Caminiti* test informs whether the state has relinquished its right of control over the jus publicum through *legislation*, not through a state agency's administrative rulemaking authority. *Id*. "Second, the duty imposed by the public trust doctrine devolves upon the State, not any particular state agency thereof." *Rettkowski*, 122 Wn.2d at 232. Our Supreme Court has repeatedly held that Ecology's enabling statute does not allow it to assume the public trust duties of the state and regulate in order to protect the public. *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 99, 11 P.3d 726 (2000); *Rettkowski*, 122 Wn.2d at 232. Because Ecology may not assume the public trust duties of the state, it could not have "give[n] up control" over the jus publicum by enacting the Rule at issue here. Br. of Appellant at 36.

Further, the *Rettkowski* court observed that the issue before it implicated Ecology's regulatory authority under a specific provision of the state water code. 122 Wn.2d at 232-33. The court held that the public trust doctrine "could provide no guidance as to *how* Ecology is to protect those waters" because that guidance "is found only in the Water Code." *Id.* at 233. Our Supreme Court later adhered to this analysis and declined to use the public trust doctrine as an additional canon of construction for interpreting provisions of the state Water Code. *R.D. Merrill Co., v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 134, 969 P.2d 458 (1999).

We similarly reject CELP's claim that the public trust doctrine informs our analysis here. As in *Rettowski* and *R.D. Merrill Co.*, we need not resort to the public trust doctrine as an additional canon of construction in light of the specific provisions at issue and the policies expressed in the state water code.

C.      RULEMAKING FILE

Finally, CELP challenges Ecology's failure to include three[14] documents detailing other instream flow recommendations for the Spokane River in its administrative rule-making file. We hold that CELP's challenge fails.

The APA informs what documents must be contained within an agency's rule-making file. RCW 34.05.370. It must contain:

> (a) A list of citations to all notices in the state register with respect to the rule or the proceeding upon which the rule is based;
>
> (b) Copies of any potions of the agency's public rule-making docket containing entries relating to the rule or the proceeding on which the rule is based;
>
> (c) All written petitions, requests, submissions, and comments received by the agency and all other written material regarded by the agency as important to adoption of the rule or the proceeding on which the rule is based;
>
> (d) Any official transcript of oral presentations made in the proceeding on which the rule is based or, if not transcribed, any tape recording or stenographic record of them, and any memorandum prepared by a presiding official summarizing the contents of those presentations;

---

[14] CELP does not identify the specific documents it believes were improperly excluded from Ecology's rule making file. Instead, it references the third section of its briefing in which it discusses various WDFW memos that were absent from the rule- making file. There, CELP explains that as part of the trial court proceeding, it moved to supplement the administrative record with three documents: (1) Ecology's comments to FERC during Avista's dam relicensing, (2) an April 23, 2007, memo from Beecher noting a peak habitat rearing of 1040 cfs at the Spokane gage, and (3) a June 30, 2004, document in which Beecher recommends a minimum discharge of 700 cfs at the Post Falls Dam.

(e) All petitions for exceptions to, amendment of, or repeal or suspension of, the rule;

(f) Citations to data, factual information, studies, or reports on which the agency relies in the adoption of the rule, indicating where such data, factual information, studies, or reports are available for review by the public, but this subsection (2)(f) does not require the agency to include in the rule-making file any data, factual information, studies, or reports gathered pursuant to chapter 19.85 RCW or RCW 34.05.328 that can be identified to a particular business;

(g) The concise explanatory statement required by RCW 34.05.325(6); and

(h) Any other material placed in the file by the agency.

RCW 34.05.370(2)(a)-(h).

This document retention requirement is critical because we review the validity of an agency action "at the time it was taken." RCW 34.05.570(1)(b). Without a complete agency rule-making file, we would be unable to examine whether the agency acted within its authority or "without regard to the attending facts and circumstances" in enacting the challenged rule.[15] *Puget Sound Harvesters Ass'n*, 157 Wn. App. at 945.

CELP argues that Ecology's omission of certain documents from its rule-making file undermines a reviewing court's ability to examine whether the Rule was adopted through a process of reason. But we find that the record before us is adequate for review.

---

[15] Federal courts have emphasized the critical role a comprehensive rule-making record plays in evaluating the propriety of agency action. *See, e.g.*, *Fund for Animals v. Williams*, 391 F.Supp.2d 191, 196 (2005) (noting that fair review of an agency action requires the reviewing court to have no more and no less information than the agency had when it made its decision); *Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.")

We note that the documents at issue are in the record before us through CELP's motion to supplement the administrative record in the clerk's papers. Thus, we are not without knowledge of the information contained within these documents. And in reviewing these documents, we find that they are not directly related to the agency action challenged here.

The three documents CELP contends Ecology should have included in its rule-making file were created as part of Avista's relicensing process, not as part of Ecology's formal rulemaking commenced in January 2014. CELP obtained these documents through a public records act request that it sent to the WDFW, not to Ecology. And Ecology's rule writers submitted declarations stating that they did not have custody of these documents during the rule adoption process, nor did they rely on them in setting minimum instream flows at 850 cfs.

CELP appears to argue that they were nonetheless relevant because it believes that Ecology should have considered them as part of its rule making process. But RCW 34.05.370(2)(f) only requires Ecology to include in its rulemaking file the data, factual information, studies, or reports it relied upon in adopting the Rule. Thus, contrary to CELP's assertion, Ecology was not required to include these documents in its rule-making file.[16]

---

[16] CELP repeatedly argues that omission of these documents from the rule-making file precludes "effective judicial review." Br. of Appellant at 39. This argument is puzzling because CELP simultaneously asks this court to evaluate the Rule, based on the record before this court, and to hold it invalid.

And even if we agreed that the documents were directly relevant to adoption of the challenged Rule, the remedy CELP seeks is not available. CELP seeks a "remand" of the Rule to Ecology for reconsideration based on a complete record. Br. of Appellant at 46. But this remedy is not applicable. If we conclude that a rule exceeds an agency's statutory authority or is arbitrary and capricious, we invalidate the rule. *See, e.g.*, *Swinomish*, 178 Wn.2d at 602; *Puget Sound Harvesters Ass'n*, 157 Wn. App. at 938.

No. 51439-7-II

CONCLUSION

The WRA provides that perennial rivers and streams "shall be retained with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values." RCW 90.54.020(3)(a). This statutory language does not allow Ecology to establish minimum instream flows for the narrow purpose of protecting only one instream value chosen by Ecology. Instead, the statute directs Ecology to meaningfully consider a range of instream values and seek to preserve them to the fullest extent possible.

Because Ecology exceeded its statutory authority in adopting the Rule establishing minimum summer instream flows of 850 cfs, we hold the Rule is invalid.

_____, A.C.J.
Lee, A.C.J

We concur:

_____
Sutton, J.

_____
Martin, J.P.T.

27