38 P.3d 1010 (2002)
CITY OF SPOKANE, by and through its WASTEWATER MANAGEMENT DEPARTMENT, as Taxpayer, Petitioner,
v.
WASHINGTON STATE DEPARTMENT OF REVENUE, Respondent.
No. 70765-1.
Supreme Court of Washington, En Banc.
January 24, 2002.
Short, Cressman & Burgess, Brian L. Comstock, Andrew William Maron, Seattle, Amicus Curiae.
Robert Gerard Beaumier, Jr., Assistant Spokane City Attorney, Spokane, Counsel for Petitioner.
Christine Gregoire, Attorney General, Anne Elizabeth Egeler, Asst., Olympia, Counsel for Respondent.
CHAMBERS, J.
This case concerns the apportionment of sewerage[1] between collection sewerage subject to the 3.6 percent public utility tax and sewerage concerned with the transportation and treatment of sewage, which is subject to the business and occupation (B & O) services tax rate. The B & O tax rate varies, but is always lower than the public utility tax rate, and at the time of the complaint was 2.0 percent. At an administrative hearing, the Board of Tax Appeals (BTA) concluded that *1011 collection (subject to the higher tax rate) continues up to the point where no new sewage is introduced into the system. The superior court reversed, concluding that collection occurs only in the small lateral pipes, but the Court of Appeals reversed again and found for the Department of Revenue (DOR). The City of Spokane sought review of the decision of the Court of Appeals, which we granted. Spokane argues here that its large interceptor pipes should be taxed at the lower rate applicable to transfer. We reverse the Court of Appeals and affirm the superior court.

FACTS
Two different tax rates apply to sewerage. At the time under appeal, the gross income attributable to the portion involved in collection of sewage was taxed at 3.6 percent under the public utility tax, RCW 82.16.020(1)(a), while the portion involved in transport of sewage was taxed at 2.0 percent under the generic B & O statute, former RCW 82.04.290(4) (1996).[2] Washington State is the only state to identify a separate tax applicable to sewage collection. See 3 St. Tax Guide (CCH) 9401-606 (2001).
Prior to 1985, the entire sewer system was taxed at the lower rate, the generic B & O tax. However, in 1985, the Legislature imposed a new 3.6 percent public utility tax on the gross income of businesses involved in "sewerage collection:"
Public utility tax imposedAdditional tax imposedDeposit of moneys. (1) There is levied and there shall be collected from every person a tax for the act or privilege of engaging within this state in any one or more of the businesses herein mentioned. The tax shall be equal to the gross income of the business, multiplied by the rate set out after the business, as follows:
(a) Express, sewerage collection, and telegraph businesses: Three and six-tenths percent;
RCW 82.16.020. The goal was to increase revenue in order to help fund the newly created public works assistance account.
Pursuant to this statute, the DOR promulgated a regulation imposing the public utility tax on all income derived from sewage collection and transport. WAC 458-20-179. At that point, no confusion existed because all sewerage was taxed at the same rate. However, the following year DOR reinterpreted the law and promulgated WAC 458-20-251 (Rule 251) restricting the tax to the portion derived from collection and leaving the remainder to be taxed at the lower rate applicable to the generic B & O statute:
The department has determined that, within the intent of the law, only the portion of gross receipts from customer billings attributable to the "collection" portion of services rendered should be taxed under the public utility tax classification.
WAC 458-20-251(2). Although neither the rule nor the statute from which it was derived defines the term "collection," Rule 251 specifies that collection does not include transfer, treatment, or disposal of sewage. WAC 458-20-251(3)(a). However, a difference of opinion arose about where sewage collection ends and sewage transfer begins.
Spokane manages hundreds of miles of sewer pipes, which take sewage from the customers to a sewage treatment and disposal plant. The pipes range in diameter from 4 inches to 135 inches, with 358 miles at 8 inches or less, and 397.42 miles at more than 8 inches, totaling 755.52 miles.[3] Sewage from each property empties into a lateral pipe, and these laterals run along the street. Each lateral pipe is up to 8 inches in diameter and collects sewage from up to 72 homes. The largest building in Spokane uses 8 inch laterals, and of the 80,000 sewer connections maintained by the City of Spokane, only 1-2 percent have lateral lines exceeding 8 inches in diameter. A lateral has no other common tributary to it. For accounting convenience, Spokane classifies all pipes of 8 inches or less as laterals and those over 8 inches as interceptors or trunks.[4]
*1012 Until the 1950s, the laterals emptied directly into the nearest convenient river or lowland area. When treatment plants became prevalent, however, large interceptor pipes were installed to transport sewage from the point where the sewage was formerly discharged from laterals to exit the system. These interceptors carried the sewage to the treatment facility. Interceptors are at least 8 inches in diameter and are often up to 12 feet in diameter.
Bill Peacock, Senior Engineer for Spokane's Wastewater Department, testified at the BTA hearing that from the point where the lateral feeds into the interceptor, the primary function of the sewerage is transfer of the sewage to the plant:
[O]nce that sewage hits here, it's on its freeway to the plant, and it doesn't care how many cars or how many people flush their toilet; it's moving that direction and moving there only.
Tr. of Hr'g Before BTA at 70.
About 1,600 (1 or 2 percent) of Spokane's customers are located along an interceptor line, and their sewage empties directly into the interceptor. Installation of laterals from these buildings would be an unnecessary duplication.
At certain points in the system, where gravity is inadequate to propel the sewage, lift stations propel the sewage uphill through pressurized pipes called force mains. After the hill is overcome, force mains reconnect to the gravity flow system. This process may be repeated several times until the sewage reaches the treatment facility. A pressurized pipe is unable to collect sewage, but can only transfer it. No such pumps are found in the laterals.
When Rule 251 was adopted, Spokane defined 23.99 percent of its assets as collection sewerage, with the remaining 76.01 percent engaged in transfer and treatment. A DOR audit that year concluded that Spokane owed $70,000 in taxes, assuming that collection continues until the point where no further collection lines enter the system prior to entry into the treatment plant. If one home emptied into an interceptor pipe, DOR considered the pipe to be a collection line rather than a transfer line. This definition labeled 99.39 percent of Spokane's pipes as collection sewerage, leaving less than 1 percent as transfer sewerage. The remainder of the noncollection income was from the treatment plant, which is the most expensive component of sewerage.
After paying, Spokane petitioned DOR for a refund, arguing that neither interceptor lines nor pressurized lines should be counted as collection lines, and that they should therefore be taxed at the lower B & O rate. The BTA upheld DOR's ruling, and the superior court reversed. The Court of Appeals upheld the original ruling, holding that a sewerage system collects sewage until the last point at which new sewage is introduced, and only after that point is the sewerage devoted to transfer. Spokane seeks review.

ANALYSIS
The Administrative Procedure Act, chapter 34.05 RCW, governs appeals from BTA. Spokane does not challenge any of BTA's findings of fact, so they are verities on appeal. Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 407, 858 P.2d 494 (1993). When reviewing a question of law, the appellate court grants relief if the agency "erroneously interpreted or applied the law." RCW 34.05.570(3)(d). Review is de novo. Enter. Leasing, Inc. v. City of Tacoma, 139 Wash.2d 546, 551, 988 P.2d 961 (1999). Spokane has the burden of showing that BTA's decision was erroneous. RCW 34.05.570(3)(e).
RCW 82.16.020, the statute imposing the public utility tax, does not define the term "collection" for the purpose of determining where "sewerage collection" ends. Spokane urges a substantial use test, arguing that collection ends at the point where the sewerage is used primarily for the purpose of sewage transfer. DOR, on the other hand, urges a sole use test, arguing that collection continues until the point at which the sewerage is used exclusively for sewage transfer.
*1013 When attempting to determine where collection ends and where transfer begins, DOR incorporated a definition of "collection" into Rule 251:
"Sewerage collection business" means the activity of receiving sewage deposited into and carried off by a system of sewers, drains, and pipes to a common point, or points, for disposal or for transfer to treatment for disposal, but does not include such transfer, treatment, or disposal of sewage.
WAC 458-20-251(3)(a).
The State argues that if collection includes "carry[ing] off" as well as receiving sewage, then collection must have a transportation component. Thus, deferring to the agency, BTA accepted DOR's proposition that the pipes are involved in collection up to the point where the last customer hook-up enters the system. The Court of Appeals, in affirming the BTA, concluded that although RCW 82.16.020 does not define the term "collection," Rule 251 unambiguously defines the term. We agree that Rule 251 and RCW 82.16.020 are unambiguous, but conclude that the Court of Appeals erred in holding that collection necessarily occurs until the last common point.[5]
DOR argues that because the word collection has a well-accepted, ordinary meaning, we should turn to a regular dictionary for its definition. However, the term "collection" as used in this context is a technical term. Technical language should be given its technical meaning when used in its technical field. Keeton v. Dep't of Soc. & Health Servs., 34 Wash.App. 353, 361, 661 P.2d 982 (1983). In other contexts, courts have turned to the technical definition of a term of art even where a common definition is available. See, e.g., Hickle v. Whitney Farms, Inc., 107 Wash.App. 934, 945, 29 P.3d 50 (2001) (holding that in the context of designated dangerous wastes, the word "designate" is broader than its common meaning and covers wastes other than those listed by name in the regulation); Blue Mountain Mem'l Gardens v. Dep't of Licensing, 94 Wash.App. 38, 42, 971 P.2d 75 (1999) (holding that the word "vault" is a term of art in the burial industry); San Juan County v. Ayer, 24 Wash.App. 852, 854, 604 P.2d 1304 (1979) (interpreting "obliterated" as a surveying term of art). But see City of Seattle v. Richard Bockman Land Corp., 8 Wash.App. 214, 217, 505 P.2d 168 (1973) (declining to define "floating home," "floating home site," and "floating home moorage" as terms of art).
A "collecting sewer" is defined by the industry as a "lateral," which in turn is defined as "[a] branch sewer buried in the street, collecting sewage from the house drains, and delivering into an intercepting sewer." John S. Scott & Paul G. Smith, Dictionary of Waste and Water Treatment 63, 174 (1983). An "intercepting sewer" is "[a] main sewer, one that receives its flow from laterals. It delivers either to another main sewer or to a treatment plant or an outfall. Intercepting sewers were originally so called because they intercepted polluting drains flowing to a river."[6] Scott & Smith, supra, at 166. Another definition of intercepting sewer is "`a sewer which receives dry-weather flow from a number of transverse sewers or outlets ... and conducts such waters to a point for treatment and disposal.'" Howard E. Babbitt & E. Robert Baumann, Sewerage and Sewage Treatment 4 (8th ed.1967) (quoting Am. Pub. Health Assoc. et al., Glossary of Water and Sewage Control Engineering (1949)).
A third source defines collector and interceptor sewerage as mutually exclusive. A collector sewer is "[a] sewer located in the public way that collects wastewater discharged *1014 through building sewers and conducts such flows to larger interceptor sewers." Joint Task Force of the Water Envtl. Fed'n & the Am. Soc'y of Civil Eng'rs, Existing Sewer Evaluation and Rehabilitation, WEF Manual of Practice FD-6, ASCE Manuals and Reports on Engineering Practice No. 62, at 242 (2d ed.1994). An interceptor sewer is "[a] sewer that receives the flow from collector sewers and conveys the wastewater to treatment facilities." Id. at 250.
Thus, under either the technical or the nontechnical definition, laterals are clearly collection sewerage, a point over which there is no dispute. However, in contrast with the nontechnical meaning, the technical definition of "collecting sewer" does not extend to interceptors, which are defined in terms of a "delivery" or conducting function. The historical note on interceptors included within the Scott & Smith definition lends further support. If interceptors were introduced for the express purpose of transferring sewage from its original polluting outlet to a treatment plant, their original purpose was purely transfer. DOR does not cite to any evidence to support a change in that function.
This Court has frequently held that when a word has a well-accepted, ordinary meaning, we should turn to a regular dictionary for its definition. See, e.g., State v. Pacheco, 125 Wash.2d 150, 154, 882 P.2d 183 (1994); Am. Legion Post No. 32 v. City of Walla Walla, 116 Wash.2d 1, 8, 802 P.2d 784 (1991); State v. Fjermestad, 114 Wash.2d 828, 835, 791 P.2d 897 (1990). However, where an otherwise common word is given a distinct meaning in a technical dictionary or other technical reference and has a well-accepted meaning within the industry, and when the word is used in a rule promulgated by an expert agency familiar with the technical meaning, courts should turn to a technical rather than a general purpose dictionary to resolve ambiguities in its definition. In this case, much turns on the definition of the word "collection" in Rule 251. In view of the fact that "collecting sewer" has a distinct definition in the technical field of sewerage, it is a term of art and must be interpreted in the technical context. As a term of art within the sewage industry, a lateral should be defined as a "collecting sewer." Interceptor sewers are, according to the technical definition and the accepted usage, involved in transfer of sewage, regardless of whether an occasional house hooks into them.
Adoption of the substantial use test avoids several practical problems. Under the position taken by the Court of Appeals, a portion of pipe that is classified as transfer one day can be transformed to a collection pipe merely by having another house hook into it. This could create complicated accounting problems, necessitating different accounting every time a new house is hooked into an interceptor.[7]

CONCLUSION
As Justice Holmes said, "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918). In this case, the word "collection" has a distinct meaning when used in the context of sewerage. When imposing the tax, the Legislature used the term "sewerage" which, unlike the commonly used term "sewer," is a technical term. We adopt the substantial use test for determining where collection ends and transfer begins, holding that a lateral is a collection sewer, whereas an interceptor is involved in transfer of sewage. Such a test is consistent with common usage and industrial usage. Using Bill Peacock's analogy, a freeway remains a freeway even though an occasional street intersects it. Accordingly, we reverse the Court of Appeals and reinstate the decision of the superior court, which adopted the substantial use test.
*1015 ALEXANDER, C.J., and SMITH, JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, OWENS, JJ., concur.
NOTES
[1] "Sewerage" refers to the physical facilities (pipes, lift stations, treatment and disposal facilities) through which sewage flows.
[2] The B & O tax rate varies, but at that time was 2.0 percent.
[3] Some estimates suggest the total is closer to 800 miles.
[4] Interceptors or trunks are large sewers into which other sewers discharge. Howard E. Babbitt & E. Robert Baumann, Sewerage and Sewage Treatment 4 (8th ed.1967). Spokane claims that because a few laterals are over 8 inches, this accounting favors the state.
[5] The parties devoted extensive briefing to an apparent conflict between two legal principles. This Court shows considerable deference to the interpretation of an agency charged with interpreting a statutory scheme. Impecoven v. Dep't of Revenue, 120 Wash.2d 357, 363, 841 P.2d 752 (1992) (citing State v. Elgin, 118 Wash.2d 551, 555, 825 P.2d 314 (1992)). However, "if there is any doubt as to the meaning of a tax statute, it must be construed against the taxing power." Duwamish Warehouse Co. v. Hoppe, 102 Wash.2d 249, 254, 684 P.2d 703 (1984). Because we hold that the statute is unambiguous, this is not an issue.
[6] An outfall is the point of discharge into a river, lake, sea, etc.
[7] Taken to its extreme, a bathroom facility at the sewage treatment plant would render all sewerage upstream of that point "collection" sewerage and would give Spokane a strong economic incentive to create unnecessary laterals rather than allowing houses close to the treatment plant to hook up to the interceptor. While by no means dispositive, this is one further reason to favor the substantial use test.