**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 6, 2020

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 6, 2020

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CENTER FOR ENVIRONMENTAL LAW AND POLICY; AMERICAN WHITEWATER; and SIERRA CLUB, | ) ) ) ) | No. 97684-8 |
| Respondents, | ) ) | |
| v. | ) ) | En Banc |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, and JAY INSLEE, | ) ) ) ) | |
| Petitioners. | ) ) | Filed  August 6, 2020 |

MADSEN, J.—This case concerns the authority of the Department of Ecology to set minimum instream flows for the rivers and streams in this state and the parameters of that authority under RCW 90.22.010 and RCW 90.54.020(3)(a) (discussed below). At issue is whether Ecology properly adopted a rule, WAC 173-557-050, setting a summertime minimum instream flow rate for the Spokane River at 850 cfs (cubic feet per second) from June 16 to September 30. We uphold that rule, determining that the

challengers[1] of the agency rule fail to carry their burden to show the rule's invalidity. We reverse the Court of Appeals' decision, which reversed the trial court's dismissal of the challengers' suit.

## I. FACTS

### A. The Spokane River's water challenges

The Spokane River originates at the outlet of Coeur d'Alene Lake in Idaho and flows west for approximately 111 miles to the Columbia River in eastern Washington. The Spokane River and the Spokane Valley-Rathdrum Prairie Aquifer are located in eastern Washington and encompass portions of the cities of Spokane, Spokane Valley, Liberty Lake, and Millwood. The river and the aquifer are shared resources between Idaho and Washington.

Flows in the river are declining due to increased groundwater use from the aquifer. Ecology thus ceased issuing new groundwater rights from the aquifer in the 1990s. The river is central to both the area's local economy and its community.

### B. Hydroelectric dams shape river flows

Avista Corporation operates five hydroelectric projects located on the Spokane River in northern Idaho and eastern Washington. The uppermost project on the river, the Post Falls development, consists of three dams on three channels with natural islands connecting the structures. The development impounds nine miles of the Spokane River to the outlet of Coeur d'Alene Lake.

---

[1] The "challengers" of Ecology's rule include the Center for Environmental Law and Policy, the Sierra Club, and American Whitewater.

Avista uses its Post Falls facility to regulate flows in the Spokane River for six months a year starting in summer, after spring runoff flows have peaked and subsided. Avista regulates river flows in accordance with minimum flow requirements in its federal license, which incorporates other considerations of lake level; downstream flow considerations; energy demands; flood control; and upstream recreational, residential, and commercial interests. Throughout the summer recreation season, Coeur d'Alene Lake is maintained at a higher level, but after Labor Day, Avista begins to release stored water at Post Falls, resulting in a gradual drawdown in lake levels. The timing of the drawdown varies annually based on flow conditions, weather forecasts, and energy demands.

Avista, as a condition of its federal license to operate its projects, is required to implement measures to protect and enhance fish, wildlife, water quality, recreation, cultural, and aesthetic resources at the project. The license requires Avista to operate the Monroe Street and Upper Falls dams to provide minimum flows of 850 cfs from June 16 to September 30 each year. The flows are intended to enhance aquatic habitat for rainbow trout and mountain whitefish in the Spokane River. Avista's federal license also requires Avista to release flows from Post Falls dam ranging from 3,300 cfs to 5,500 cfs for whitewater boating. Flows that serve the recreational community occur every year on the Spokane River, but the timing and duration of those recreational flows varies.

To change the actual flow in the river to better suit a particular recreational use would require seeking changes in Avista's license because it has control over water storage and releases as provided in its federal license. Ecology's rule WAC 173-557-050

does not require control or release of water from storage. An instream flow rule does establish regulatory flows with a priority date as to other water rights, meaning new uses are subject to the prior established instream flow rules.[2] WAC 173-557-050 does not put water in the river or affect existing water rights. Ecology personnel gave a presentation at the public hearing for the proposed instream minimum flow rule in Spokane in October 2014, explaining that Avista's federal license controls minimum releases to the river and that Ecology's instream flow rule addresses only new junior water uses and when they are interruptible to protect the instream flow. The presentation also noted that Ecology's minimum instream flow rule does not change the hydrograph.[3]

    C.  Ecology sets minimum river flows via rule making

Ecology began working with watershed planning groups in 1998 to develop instream flow protection for the Spokane River. The planning unit failed to reach consensus on instream flow levels during its planning process. Because no consensus could be reached, Ecology chose to use science-based fish studies as a baseline to develop the instream flow rule.[4]

---

[2] *See, e.g*., RCW 90.03.247(1) (providing in part, "Whenever an application for a permit to make beneficial use of public waters is approved relating to a stream or other water body for which minimum flows or levels have been adopted and are in effect at the time of approval, the permit shall be conditioned to: (a) [p]rotect the levels or flows; or (b) require water resource mitigation of impacts to instream flows").

[3] *See* Admin. Record (AR) at 2809; *see also* AR at 3006, 3016 (Ecology's CONCISE EXPLANATORY STATEMENT (2015) (noting that the instream flow rule does not control the hydrograph of the river and that river flow is controlled by dam discharges as regulated under Avista's license issued by the Federal Energy Regulatory Commission)).

[4] If a watershed planning unit (local stakeholders) reaches consensus on instream flows during the watershed planning process, then Ecology must adopt those flows by rule. *See* RCW 90.82.080(1)(b). If a planning unit does not reach consensus on flows, as occurred here, then

Ecology formally commenced rule making in January 2014. Using a deliberative process, Ecology ultimately set summer minimum flows at 850 cfs by relying on science-based fish studies that protected fish as a baseline and that also served to protect other instream values, including recreation, navigation, and aesthetics.

In 2012, Washington Department of Fish and Wildlife instream flow biologist Dr. Hal Beecher wrote his flow recommendations for the Spokane River, which Ecology ultimately adopted. In his summary, Dr. Beecher wrote that the recommended minimum instream flow for the Spokane River is 850 cfs from June 16 to September 30. Dr. Beecher notes that "[i]nstream flows should address what the river needs to preserve its values and resources and ecological functions." Admin. Record (AR) at 3831. He notes how flows were developed in cooperation with Ecology with an emphasis on fish and based on the results of four scientific studies:

> In developing instream flow recommendations for the lower Spokane River, the Washington Department of Fish and Wildlife . . ., in cooperation with Department of Ecology (Ecology), has emphasized rainbow trout and mountain whitefish. . . .

> Results of several studies (EES Consulting 2007, NHC and HD 2004, Parametrix 2003a,b, Addley and Peterson 2011) provide information on trout and whitefish habitat at different flows and different seasons in the lower Spokane River.

AR at 3832.[5] Based on these studies, Dr. Beecher ultimately concluded that "a flow of 850 cfs should be protected." AR at 3834; *see also* AR at 7753 (Beecher

---

Ecology may initiate rule making under the Administrative Procedure Act, ch. 34.05 RCW, to adopt flows. *See* RCW 90.82.080(1)(c).

[5] The noted studies are found in the AR at 3842, 3883, 4157, and 3981, respectively.

recommendation of 850 cfs flow rate at Spokane gage for June 16 to September 30

period); *see also* AR at 3831 (Beecher summary stating the same recommendation).

During the rule adoption period, Ecology received many comments regarding its

decision to set summer flows at 850 cfs. Ecology responded:

> Ecology does not agree that the instream flow levels adopted in this rule are too low to protect instream resources in the Spokane River. Ecology believes the instream flows in this rule, based as they are on four independent fish studies, are science-based. The flows have been vetted by top scientists, staff, and management of all concerned state agencies. The instream flows have been reviewed and analyzed by all local Water Resource Inventory Area Watershed planning groups. *Since these flows were first proposed to the planning unit, no entity has emerged with scientific information to indicate these flows are not appropriate.* It is our opinion these flows are the best flows available to protect the instream resources of the Spokane River. *They are flows necessary for stream health, ecological function, and preservation of other instream resources including scenic, aesthetic, and navigational values.*

AR at 3031 (emphasis added).

Ecology also responded to concerns about recreation, aesthetics, and navigational

values, noting that it considered these issues at multiple stages throughout the rule

making process and that the subjects were addressed in detail during Avista's Federal

Energy Regulatory Commission (FERC) relicensing process for their hydroelectric

facilities.

The subject of recreational, aesthetic, and navigational flows was also addressed

during the watershed planning process and during the comment period on preliminary

drafts of the minimum instream flow rate rule. Ecology noted that it had reviewed the

whitewater paddling study conducted during Avista's relicensing process; listened to

many river users; and reviewed anecdotal observations, opinions, and photos submitted

by whitewater enthusiasts and others. Ecology then explained in detail why it chose not to set flows based on recreational needs and why not setting flows based on those needs is not the same as not considering them:

> They [(recreational flows)] were considered by the department and rejected as the primary basis for establishing instream flows. Ecology chose to use science-based fish studies to develop the instream flow values for the rule when the Watershed Planning unit failed to reach consensus about instream flow values . . . . While [the flows] are based on fish habitat studies, the instream flow levels established in [the] rule will preserve wildlife, scenic, aesthetic, and other environmental values in the Spokane River, in accordance with RCW 90.54.020.

AR at 2985.

Ecology specifically responded to comments and concerns regarding recreation noting that "[f]lows that serve the recreational community occur every year in the Spokane River." AR at 3009.[6] The agency also addressed and responded to comments on aesthetics and climate change.

Following the Administrative Procedure Act (APA), ch. 34.05 RCW, rule making process, Ecology adopted WAC 173-557-050 on January 27, 2015, and the rule became effective on February 27, 2015. On February 29, 2016, challengers petitioned Ecology to amend the rule pursuant to RCW 34.05.330,[7] asserting that the summer flows were set too low. On April 27, 2016, Ecology denied challengers' petition.

---

[6] Ecology considered in detail the Berger 2004 whitewater boating study, how the whitewater community utilizes the Spokane River, and that such community's members express a significant range of needs and desires. *See* AR at 3031-33.
[7] RCW 34.05.330(1) provides that "[a]ny person may petition an agency requesting the adoption, amendment, or repeal of any rule."

D. The present lawsuit

In May 2016, challengers brought suit against Ecology in Thurston County Superior Court under the APA, challenging the validity of the summer minimum instream flow rate and arguing that setting minimum flows at 850 cfs exceeded Ecology's authority and was arbitrary and capricious. Challengers also argued that in adopting the rule, Ecology had failed to fulfill its responsibilities under the public trust doctrine, and they moved to supplement the record. *Ctr. for Envtl. Law & Policy v. Dep't of Ecology*, 9 Wn. App. 2d 746, 757, 444 P.3d 622 (2019). The superior court denied challengers' motion to supplement and ultimately denied the petition challenging the validity of Ecology's rule. *Id.* Challengers sought direct review at this court, but the matter was transferred to Division Two of the Court of Appeals, which affirmed the trial court's rejection of the motion to supplement the record and also rejected challenger's public trust doctrine argument. *Id.* at 769-74. But the Court of Appeals held the rule was invalid, agreeing with challengers that Ecology's action exceeded its authority and was arbitrary and capricious. *Id.* at 751. Ecology petitioned for review concerning the exceeded authority and arbitrary and capricious issues. In the challengers' answer, they asked this court to consider the record supplementation issue. This court granted Ecology's petition and denied review of the issue raised in the challengers' answer. 194 Wn.2d 1016 (2020).

## II. ANALYSIS

### A. Standard of Review

"The Washington Administrative Procedure Act (APA) governs the standard of review for a challenge to an agency rule." *Lenander v. Dep't of Ret. Sys.*, 186 Wn.2d 393, 402, 377 P.3d 199 (2016). "The burden is on the challenger asserting invalidity of an administrative rule." *Id.* (citing ch. 34.05 RCW; *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003)). "An agency rule may be invalidated only if the court determines it (1) is unconstitutional, (2) is outside the statutory authority of the agency, (3) is arbitrary or capricious, or (4) was adopted without complying with statutory rule making procedures." *Id.* at 402-03 (citing RCW 34.05.570(2)(c)).

Here, the challengers claim that the portion of Ecology's rule WAC 173-557-050 setting instream flows at 850 cfs from June 16 to September 30 is invalid because in promulgating the rule, Ecology exceeded its authority and acted arbitrarily and capriciously. Center for Environmental Law and Policy's (CELP) invalidity assertion rests on its contention that Ecology failed to give consideration to recreational, navigational, and aesthetic values as required by RCW 90.54.020(3)(a).[8] As discussed more fully below, challengers' assertion fails for several reasons: (1) per the plain language of RCW 90.54.020(3)(a), the statute provides general guidelines and not required elements, (2) the administrative record shows that Ecology did consider

[8] CELP's opening brief in the trial court asserted that Ecology "appears to have ignored" views expressed at the rule making hearing by member of the public who commented that they felt 850 cfs was too low. Clerk's Papers (CP) at 200 (Pet'rs' Am. Opening Brief at 18 n.59).

recreational and other values during the rule making process, and (3) evidence in the record shows that, in fact, the summer flow rate rule provides base flows that sustain recreation and navigation as well as fish habitat.

B. Burden

The validity of an agency rule is a question of law subject to de novo review. *Wash. Rest. Ass'n v. Wash. State Liquor Control Bd.*, 200 Wn. App. 119, 126, 401 P.3d 428 (2017) (citing *Kabbae v. Dep't of Soc. & Health Servs.*, 144 Wn. App. 432, 439, 192 P.3d 903 (2008)). "When an agency acts within its authority, a rule is presumed to be valid and, therefore, the 'burden of demonstrating the invalidity of agency action is on the party asserting the invalidity.'" *Wash. Fed'n of State Emps. v. Dep't of Gen. Admin.*, 152 Wn. App. 368, 378, 216 P.3d 1061 (2009) (quoting RCW 34.05.570(1)(a)). "The party asserting the invalidity must show compelling reasons why the rule conflicts with the intent and purpose of the legislation." *Id.* (citing *Weyerhaeuser Co. v. Dep't of Ecology*, 86 Wn.2d 310, 317, 545 P.2d 5 (1976)). "Any rule that is 'reasonably consistent' with the underlying statute should be upheld." *Id.* (quoting *Green River Cmty. Coll. v. Higher Educ. Pers. Bd.*, 95 Wn.2d 108, 112, 622 P.2d 826 (1980), *modified on reh'g by* 95 Wn.2d 962, 633 P.2d 1324 (1981)).

C. Plain meaning

When construing a statute, this court's goal is to determine and effectuate legislative intent. *Swinomish Indian Tribal Cmty. v. Dep't of Ecology*, 178 Wn.2d 571, 581, 311 P.3d 6 (2013) (citing *TracFone Wireless, Inc. v. Dep't of Revenue,* 170 Wn.2d 273, 281, 242 P.3d 810 (2010); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d

1, 9-10, 43 P.3d 4 (2002)). Where possible, the court gives effect to the plain meaning of the language used as the embodiment of legislative intent. *Id*. (citing *TracFone*, 170 Wn.2d at 281; *Campbell & Gwinn*, 146 Wn.2d at 9-10). The court determines plain meaning from all that the legislature has said in the statute and related statutes that disclose legislative intent about the provision in question. *See id*.; *see also TracFone*, 170 Wn.2d at 281; *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003); *Campbell & Gwinn*, 146 Wn.2d at 11. In general, words are given their ordinary meaning, but when technical terms and terms of art are used, the court gives these terms their technical meaning. *Swinomish Indian Tribal Cmty*, 178 Wn.2d at 581-82 (citing *Tingey v. Haisch*, 159 Wn.2d 652, 658, 152 P.3d 1020 (2007); *City of Spokane ex rel. Wastewater Mgmt. Dep't v. Dep't of Revenue*, 145 Wn.2d 445, 452, 454, 38 P.3d 1010 (2002)).

And, as this court noted in *Swinomish Indian Tribal Community*, "resolving the meaning of a statutory provision concerning water rights almost always requires consideration of numerous related statutes in the water code." *Id*. at 582 (citing *Campbell & Gwinn*, 146 Wn.2d at 12-17; *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77-83, 11 P.3d 726 (2000)). Accordingly, this court considers "the statutory context, related statutes, and the entire statutory scheme" when ascertaining the plain meaning of a statute concerning water rights. *Id*. (citing *TracFone*, 170 Wn.2d at 281; *Unruh v. Cacchiotti*, 172 Wn.2d 98, 113, 257 P.3d 631 (2011)).

D. <u>Ecology did not act beyond its authority when promulgating the summertime minimum flow rule at issue</u>

The case concerns the interplay of two statutes, RCW 90.22.010 and RCW 90.54.020(3)(a). RCW 90.22.010 states in relevant part, "The department of ecology *may* establish minimum water flows or levels for streams, lakes or other public waters *for the purposes of protecting fish*, game, birds *or* other wildlife resources, *or* recreational or aesthetic values of said public waters whenever it appears to be in the public interest to establish the same." (Emphasis added.)

RCW 90.54.020 is a "[g]eneral declaration of fundamentals for utilization and management of waters of the state," and provides that "[u]tilization and management of the waters of the state shall be guided by the following general declaration of fundamentals: [including] . . . The quality of the natural environment shall be protected and, where possible, enhanced as follows: . . . Perennial rivers and streams of the state *shall* be retained with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic *and* other environmental values, and navigational values." RCW 90.54.020, .020(3)(a) (emphasis added) (boldface omitted).

Division Two read the above emphasized language in RCW 90.54.020(3)(a) as requirements and held that "Ecology must meaningfully consider the instream values enumerated in RCW 90.54.020(3)(a), and attempt to preserve them to the fullest extent possible." *Ctr. for Envtl. Law & Policy*, 9 Wn. App. 2d at 764-65. The Court of Appeals reversed the dismissal of the challengers' suit. As explained below, this was error.

12

E.  "Shall," "or," "and"

As for the language used in these statutes, this court has noted the general rule that "It is well settled that the word 'shall' in a statute is presumptively imperative and operates to create a duty.  The word 'shall' in a statute thus imposes a mandatory requirement *unless a contrary legislative intent is apparent.*"  *Erection Co. v. Dep't of Labor & Indus.*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993) (citations omitted).  As discussed below, a contrary legislative intent is apparent from the context and language of RCW 90.54.020.  Further, and more relevant here, this court has also noted that "[t]he meaning of 'shall' is not gleaned from that word alone because our purpose is to ascertain legislative intent of the statute as a whole."  *State v. Krall*, 125 Wn.2d 146, 148, 881 P.2d 1040 (1994).  Accordingly, the *Krall* court applied the following rule,

> "In determining the meaning of the word 'shall' we traditionally have considered the legislative intent as evidenced by all the terms and provisions of the act in relation to the subject of the legislation, the nature of the act, the general object to be accomplished and consequences that would result from construing the particular statute in one way or another."

*Id*. (quoting *State v. Huntzinger*, 92 Wn.2d 128, 133, 594 P.2d 917 (1979)).

Here, the express language of RCW 90.54.020(3)(a) provides "general declaration of fundamentals," it provides guidelines, not elements that must be met.  Even if this court were to interpret RCW 90.54.020(3)(a) as embodying a mandatory requirement, the plain language at issue would direct only that "[p]erennial rivers . . . of the state shall be retained with *base flows* necessary to provide for preservation of . . . fish . . . and other environmental values, and navigational values."  (Emphasis added.)  Ecology's summer

instream flow rule at issue achieves such base flows as borne out by the administrative record (as discussed below).

The Court of Appeals' elevations of the *general guidance* provided in RCW 90.54.020(3)(a) to required elements does not comport with the plain language of that statute read as a whole and is error. Further, the Court of Appeals' imposed requirement that Ecology "attempt to preserve [listed values] to the fullest extent possible" also adds language to RCW 90.54.020(3)(a). *Ctr. for Envtl. Law & Policy*, 9 Wn. App. 2d at 765. Courts "must not add words [to a statute] where the legislature has chosen not to include them." *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003).

We agree with Ecology that RCW 90.22.010's plain language provides it with the authority to "establish minimum water flows . . . *for the purposes of protecting fish*, game, birds *or* other wildlife resources, *or* recreational or aesthetic values of said public waters whenever it appears to be in the public interest to establish the same." (Emphasis added.) And thus, Ecology has the authority to balance competing interests and values when setting instream flow rates. That Ecology has such authority and discretion here comports with other statutes (i.e., the general statutory scheme) concerning Ecology's mandate.[9]

---

[9] The legislature has given Ecology broad authority and discretion to manage matters concerning water. *See*, *e.g.*, RCW 43.21A.020 (creating the department of ecology "to undertake, in an integrated manner, the various water regulation, management, planning and development programs [which were] authorized to be performed by the department of water resources and the water pollution control commission"); RCW 90.03.247(2) (expressly providing "exclusive" authority to Ecology to establish minimum flows for any state stream as provided in statutes including RCW 90.22.010; noting that in setting minimum flow levels, Ecology must "during all

Further, "[a]s a default rule, the word 'or' does not mean 'and' unless legislative intent clearly indicates to the contrary." *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 319, 190 P.3d 28 (2008) (plurality opinion). As noted, the court assesses the plain meaning of a statute viewing the words of a particular provision in the context of the statute in which they are found, together with related statutory provisions, and the statutory scheme as a whole. *Id*. And the court considers the subject, nature, and purpose of the statute as well as the consequences of adopting one interpretation over another. *Id*. Accordingly, here, the legislature's use of the disjunctive "or" in RCW 90.22.010 indicates that Ecology has authority to establish minimum water flows based on *any* of the listed values, and there is no legislative intent suggesting otherwise. Indeed, the

stages of development . . . of minimum flow proposals, consult with, and carefully consider the recommendations of, the department of fish and wildlife"), .005 (noting state policy to promote use of public waters to provide maximum net benefits regarding both diversionary uses and the retention of waters within streams in sufficient quantity and quality to protect instream and natural values and rights, and providing further that "based on the tenet of water law which precludes wasteful practices in the exercise of rights to the use of waters, the department of ecology shall reduce these practices to the maximum extent practicable"); RCW 77.57.020 (noting state policy that "a flow of water sufficient to support game fish and food fish populations be maintained at all times in the streams of this state" and that "[t]he director of ecology may refuse to issue a permit if, in [her/his] opinion . . ., issuing the permit might result in lowering the flow of water in a stream below the flow necessary to adequately support food fish and game fish populations in the stream"). *See also* WAC 173-557-010(2)(a) (noting the purposes in adopting Ecology's instream flow rule at issue here include: to "[e]stablish instream flow levels necessary to protect wildlife, fish, scenic, aesthetic, recreation, water quality and other environmental values, navigational values, and stock watering requirements"), (1) (noting that Ecology "adopts this rule under the authority of the Watershed Planning Act (chapter 90.82 RCW), Water Resources Act of 1971 (chapter 90.54 RCW), Water code (chapter 90.03 RCW), Regulation of public groundwaters (chapter 90.44 RCW), Minimum Water Flows and Levels Act (chapter 90.22 RCW), Water well construction (chapter 18.104 RCW); RCW 43.21A.064(9) and 43.21A.080; and in accordance with the water resources management program regulation (chapter 173-500 WAC)").

broad mandate imposed on Ecology to oversee and integrate various water regulation, management, planning and development programs, *see supra* note 9, attests to the appropriateness of Ecology applying its discretion in the present circumstance.

As noted, the statutes discussed give Ecology the authority to decide instream flows and to exercise its discretion in doing so, guided by the statutes. Moreover, the administrative record (some 19,000 pages) concerning rule making supports that Ecology appropriately did so. That record included multiple fish habitat studies and recreational considerations as contained in dam license renewals that were included in the record (i.e., a survey study seeking input from whitewater users regarding their preferences/comments about different specific flow rates). Also, many comments were submitted by recreational users stating that they *preferred* to have greater summer cfs flows (they typically preferred 1500 cfs). Ecology responded to all such comments, explaining that its rule provided for both fish habitat and other values (recreation, navigation, and aesthetics). This conclusion is supported by the record, which contained photographs of recreational/navigational use of the river at flow rates lower than those provided in the rule.[10]

For the reasons noted above, challengers' contention that Ecology acted outside its authority in promulgating a rule setting the minimum instream summertime flow rates for the Spokane River at 850 cfs fails.

---

[10] *See* AR at 11590, 11594, 11595, 11597, 11599, 11603 (showing various craft recreating/navigating the river at 770 cfs including hard-shell kayak, inflatable kayak, a small cataraft, and tubes).

    F.  Ecology did not act arbitrarily or capriciously in promulgating the summertime minimum flow rule at issue

    As noted, the challengers in this case also asserted that Ecology's rule that set summertime minimum flow rates for the Spokane River is invalid because it is arbitrary and capricious.  This court may grant relief if the agency's action or order is "'arbitrary or capricious.'"  *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 589, 90 P.3d 659 (2004) (quoting RCW 34.05.570(3)(i)).  This court has defined arbitrary or capricious agency action as action that is willful and unreasoning and taken without regard to the attending facts or circumstances.  *Id.*  "Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion."  *Id.*  "This court should not 'undertake to exercise the discretion that the legislature has placed in the agency.'"  *Id.* (quoting RCW 34.05.574(1)); *see also Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997) (if there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous).  Further, "neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious."  *Rios v. Dep't of Labor & Indus.*, 145 Wn.2d 483, 504, 39 P.3d 961 (2002); *see id.* at 504-05 (challengers of agency rule making decision had not met their burden to show that the agency's rule making was "arbitrary or capricious" in light of the record; that is, challengers failed to show that the agency action was "unreasoning," meaning not rational at the time it was made).

Here, it cannot be said that Ecology's promulgation of the rule concerning summertime minimum flow rates was unreasoning. As noted, the substantial administrative record concerning the rule making included multiple fish habitat studies[11] and recreational considerations contained in documentation concerning dam license renewals that were included in the record.[12] Also, many comments were submitted by recreational users stating that they *preferred* to have greater summer cfs flows. Ecology responded to all such comments, explaining that its rule provided for both fish habitat and other values (recreation, navigation, and aesthetics).[13]

---

[11] *See* CP at 389 (AR at 2803) (noting four campaigns of fish science investigations from 2000 through 2011, which served as the basis for setting minimum flows to protect fish at 850 cfs for June 16 to September 30).

[12] *See* CP at 310-74 (AR at 2225-89) (WHITEWATER PADDLING INSTREAM FLOW ASSESSMENT STUDY REPORT SPOKANE RIVER PROJECT, FERC NO. 2545 (2004)); CP at 330 (AR at 2245) (noting that nearly all whitewater survey participants preferred higher flows than those they experienced during the survey).

[13] Ecology's published response to one comment requesting higher cfs flows stated:

> Flows that serve the recreational community occur every year in the Spokane River. What varies from year-to-year is the timing and duration of those recreational flows. The instream flow rule cannot change the hydrograph or control river operations. The proposed instream flows are protective of fisheries uses. While the instream flow levels are based on fish studies, they also ensure flow in the river for preservation of other instream values, including scenic, aesthetic and navigational values.

CP at 439 (AR at 3009). In another published response to a submitted comment, Ecology stated:

> Ecology does not agree the requested [higher] instream flow levels are better than those set in this rule. No data or studies are presented in these comments to support the suggested flows. The instream flow numbers established in this rule are supported by four scientific studies conducted specifically to evaluate the instream needs of the fisheries resources present in the river at all of their various life stages. Flows suitable for rafting in the River occur every year and the timing of these suitable flows is dependent on each year's hydrograph. An instream flow rule does not change the hydrograph, it simply functions to condition new, junior, water uses to be interruptible to protect the instream flow. To physically manipulate and modify the flow in the river to satisfy any particular use, it would

The administrative record establishes that Ecology's promulgation of the summertime minimum flow rate for the Spokane River was not unreasoning. Challengers have failed to establish that Ecology's action was arbitrary or capricious.

For the reasons discussed above, the challengers failed to meet their burden to show that Ecology's rule that set summertime minimum flow rates for the Spokane River was invalid. Accordingly, the Court of Appeals erred in reversing the trial court's dismissal of challengers' suit alleging invalidity of Ecology's rule WAC 173-557-050.[14]

## III. CONCLUSION

Ecology has authority under RCW 90.22.010 to set minimum instream flows for the rivers and streams in this state and properly promulgated WAC 173-557-050, a rule setting a summertime minimum instream flow rate for the Spokane River at 850 cfs from June 16 to September 30. Challengers of that rule fail to carry their burden to show the

---

take a modification of the FERC licenses issued for Avista's dams on the Spokane River. Those licenses were most recently re-issued in 2009.

CP at 468 (AR at 3038); *see also* Ecology's "Concise Explanatory Statement" at CP at 402 (AR at 2972). This explanatory statement included "Reasons for Adopting the Rule" (CP at 408) (AR at 2978), which stated in part, "Instream resources that need protection in the mainstem Spokane River include Redband Trout, Mountain Whitefish, and all aquatic species that require water for habitat. Additional resources and beneficial uses include: water quality, riparian habitat, wildlife, recreation such as fishing, rafting, kayaking, boating and swimming, and the scenic and aesthetic value of the river." CP at 409 (AR at 2979).

[14] Amicus Washington Kayak Club and Paddle Trails Canoe Club attempt to reargue application of the public trust doctrine. The Court of Appeals rejected the public trust doctrine's application here as an additional basis for attacking the validity of Ecology's rule, and the challengers did not seek review of that determination. Application of the public trust doctrine is not properly before this court. "'This court generally does not consider issues that are raised only by an amicus.'" *State v. James-Buhl*, 190 Wn.2d 470, 478 n.4, 415 P.3d 234 (2018) (quoting *Harris v. Dep't of Labor & Indus.*, 120 Wn.2d 461, 467, 843 P.2d 1056 (1993)); *see also State v. Hirschfelder*, 170 Wn.2d 536, 552, 242 P.3d 876 (2010) ("We need not address issues raised only by amici.").

rule's invalidity.  We reverse the Court of Appeals' decision to the extent it reversed the

trial court's dismissal of challengers' suit.

WE CONCURR:

_Stephens, C.J._

_Johnson, J._

_Owens, J._

_González, J._

_Madsen, J._

_Gordon McCloud, J._

_Yu, J._

_Montoya-Lewis, J._

_Whitener, J._